## WILLIAM MARTIEN ET AL. *vs.* THE MAYOR AND CITY COUNCIL OF BALTIMORE.

*Real Estate Broker's Right to Commissions—Sale Not Negotiated by Him—Evidence.*

Municipal officers agreed to pay plaintiff, a real estate broker, certain commissions if he negotiated the purchase of land for the municipality. Plaintiff endeavored, without success, to obtain from the owner of the land desired by the city an offer or agreement to sell at a price acceptable to it. Afterwards the municipality announced its purpose to obtain the land by condemnation, and then the landowner agreed directly with the city to submit to arbitration the question of the price to be paid, and the city acquired the land upon the payment of the award of the arbitrators. In an action by the broker to recover commissions on the sale, *held*, that since the sale had not been effected as a result of his efforts or negotiations, he is not entitled to recover.

When the declaration sets forth the claim of the plaintiff as a real estate broker to recover commissions for effecting the purchase of certain land for the defendant, evidence is not admissible to show that the plaintiff rendered services in the purchase by the defendant of other lands.

*Decided January 12th, 1909.*

Appeal from the Superior Court of Baltimore City (ELLIOTT, J.).

The cause was argued before BOYD, C. J., BRISCOE, PEARCE, BURKE, THOMAS and HENRY, JJ.

*John Philip Hill,* for the appellant.

*Sylvan Hayes Lauchheimer* (with whom was *Edgar Allan Poe* on the brief), for the appellee.

THOMAS, J., delivered the opinion of the Court.

The declaration in this case charges that on or about the 17th of May, 1906, the defendant, the Mayor and City Council of Baltimore, through its agent, the Sewerage Commission of Baltimore, entered into a contract with the plaintiffs, "whereby the plaintiffs, who are real estate brokers, were employed to negotiate the purchases of certain lands lying near Back River, in Baltimore County, Maryland, and the plaintiffs were to receive from the defendant a commission of one and one-quarter per cent. of the aggregate amount of the defendant's purchases of the said land; less whatever the plaintiffs might be able to obtain from the vendors of such land in excess of one and one-quarter per cent. of the aggregate amount of defendant's purchases of said land; that the plaintiffs entered upon the performance of said contract and fully performed and discharged all their duties and obligations thereunder; that the aggregate amount of the purchases of said land by the defendant was $205,000.00; that by reason of the purchases there became due and owing by the defendant to the plaintiffs the sum of $2,562.50, but the defendant has not paid the same."

The defendant pleaded never promised as alleged, and never indebted as alleged, and during the trial of the case, which resulted in a verdict in favor of the plaintiffs for $62.50, non pros, and judgment for defendant for costs, two exceptions were reserved by the plaintiffs, one to the rulings of the Court on the evidence, and the other to the action of the Court on the prayers, and on plaintiffs' special exception to defendant's sixth prayer.

The Court, by granting the defendant's first prayer, instructed the jury that there was no evidence in the case "legally sufficient under the pleadings to entitle the plaintiffs to recover any commission on the amount paid for the Willis lot, mentioned in the evidence," and unless there was error in granting this instruction, it will not be necessary for us to consider any of the other prayers in the case.

The Act of 1904, Ch. 349, provided for the appointment,

by the Mayor of Baltimore City, of a commission to be known as the Sewerage Commission of Baltimore City, who should have in charge the construction of a sewerage system for the City, with power to make, in the name of the Mayor and City Council of Baltimore, all contracts germane to the scope of its duties under the Act, and authorized the Mayor and City Council, acting by and through the agency of said commission, to acquire by purchase, gift or condemnation any land or property necessary for the construction or workings of such system.

The appellants, William Martien and James C. Martien, co-partners doing business under the firm name of William Martien & Co., real estate brokers of Baltimore City, knowing that the Sewerage Commission had to acquire a large lot or tract of land, needed in the construction of the proposed sewerage system, began, in the latter part of 1905 or early in 1906, to write to the Commission, making suggestions as to the character of the land in several directions from the City, which in their judgment would be desirable or suitable, and stating that they had for some time been taking an active interest in the sewerage work of Baltimore, and had collected a great deal of important data which would be useful and valuable to the Commission; that what they had done in the interest of the Commission had been done gratuitously, and tendering their services as real estate brokers whenever the Commission should decide to purchase.   After having written a number of letters of the kind, on the 15th of May, 1906, General Leary, chairman of the Commission, wrote plaintiffs in reply that the Commission was not prepared at that time to enter into the purchase of real estate for the purpose of the Commission, but as soon as the Commission was informed of the recommendation of the advisory engineers the matter would be taken up by the Commission, and that he should be glad at that time to give the plaintiffs an interview on the subject.

James C. Martien, one of the plaintiffs, states that on the 16th of May, 1906, Mr. Hendrick, the engineer, called at

plaintiffs' office, and requested them to call at the Sewerage
Commission's office that afternoon.   That when they went to
the Commission's office General Leary and Mr. Hendrick
were there, and they awaited the arrival of the Mayor, Mr.
Timanus; that while waiting for the Mayor they were ques-
tioned by General Leary regarding their business experience,
and upon the arrival of the Mayor they were told that the
Commission had decided to purchase a large tract of land;
that it was a matter "that would have to be handled very ex-
peditiously and only with the utmost confidence," and that
it was a matter of vast importance to the Commission to ac-
quire this land.   They wanted to know if the plaintiffs could
handle the matter without outside help, and upon being as-
sured by the plaintiffs that they could, they wanted to know
what commissions plaintiffs would charge, and the plaintiffs
told them two and one-half per cent. commissions; that they
said that it was a "matter of considerable magnitude, a deal
of large proportions," that the land they wanted "contained
about one square mile of territory," and that they thought
that the commissions ought to be less, and requested the plain-
tiffs to name a lower rate.   That plaintiffs told them that they
were not willing to charge less than two and one-half per
cent. but thought they could collect their commissions in a
number of instances from the land owner; that they said to
the plaintiffs that that would not be satisfactory, as the plain-
tiffs would then be representing the land owners, and they
preferred plaintiffs to represent the City; that plaintiffs then
told them that they thought they could render the City better
service by seeking to collect their commissions from the land
owners, that if they were "to go in to acquire a large tract of
land and not make an attempt to collect a commission from
the land owners, they would immediately suspicion some big
corporation was behind the transaction, and their prices would
be higher than if we attempted to collect commission from
them."   That the gentlemen representing the Commission
then agreed that the plaintiffs should collect the commissions,
if possible, from the land owners, and plaintiffs said they

would guarantee to collect at least fifty per cent. of the commissions from the land owners, if the City would pay the other fifty per cent., and the Commission agreed to that. That they then requested plaintiffs to reduce to writing the terms of the agreement, which they did as follows:

                                        BALTIMORE, May 16, 1906.

SEWERAGE COMMISSION OF BALTIMORE.

Gentlemen:—

In the matter of the purchase of property for you we hereby agree to negotiate the purchase on a basis of commission not exceeding one and one-quarter per cent. on the amount of the aggregate purchases. From our previous experience we do not anticipate the commission will amount to the above.

                        Very truly yours,

                        WILLIAM MARTIEN & COMPANY."

"The aforegoing terms are accepted by the commission.

    May 17th, 1906.          PETER. LEARY, JR., Chairman."

That after plaintiffs signed this contract, Mr. Hendrick then showed them a small sketch of the property desired by the Commission, which they said contained about one square mile; that they did not know who owned the property, but the Mayor said that "Mr. Willis was a property owner in that section;" that these gentlemen then turned the plaintiffs over to Mr. Hendrick, to whom plaintiffs were to make their reports as they progressed in the work. That the next day General Leary told them that the Commission had accepted the contract formally, and had noted the acceptance on the contract, and the plaintiffs then asked him to give them a copy of the contract, which he did. That after the contract was executed, plaintiffs, in order to find out who the owners of the land were, had to go to Back River and take a launch, and run down the river, and inquire of the man in charge of the launch as they went along the names of the land owners on either side of the river. The man showed them the lines of the Willis property, and gave them information about other properties, including the property of Mr. Jacob Nor-

ris; that they stopped, on their return up the river, at the
Norris property, and called on Mr. Norris and questioned
him about the sale of the poperty. That they made daily re-
ports to the Commission of their progress; that they were
instructed not to call on Mr. Willis until Mr. Hendrick said
so, but to gather information regarding property values, and
when plaintiffs felt prepared to see him to report to Mr.
Hendrick, and this they did on the 21st of May, and Mr.
Hendrick told them then to call on Mr. Willis. That plain-
tiffs went to see Mr. Willis the next day and told him that
they had come to see him in regard to his property; that Mr.
Willis said his property was not for sale; that plaintiffs told
him that they were not willing to accept that as his answer,
that they were there to negotiate for his property, and de-
sired to deal with him for it; that he insisted that he did not
want to sell it, and they told him he might have to sell i', and
that then Mr. Willis said, "well, now if you represent anyone
having the power of eminent domain, such as a railroad com-
pany, and can make me sell the property, I am not as foolish
as that and I will talk to you about my property;" that plain-
tiffs told him that their client had "the right of eminent do-
main," and that he said then he would talk to them, and told
them that his property contained about six hundred acres, he
did not know the correct area; that he estimated that he had
about 5000 feet on Back River, and about 1000 feet on East-
ern Avenue, and about 500 acres of inland property; that he
estimated his front on the river to be worth about $1.00 a
foot, and his front on Eastern Avenue at $2.00 a foot, and
the 500 acres at $200.00 an acre, and said that he would take
$250,000.00 for the property. That plaintiff asked him if
he could get a plat of his property for them, so that they
"could get down to correct dealing with him on his property,"
as it was not satisfactory to deal on roughly estimated acreage
or frontage, and he said Bouldin had made surveys at differ-
ent times of portions of the property, and that he would see
him. That plaintiffs made a written report of this interview
with Mr. Willis to the Commission on the 22nd of May; that

on the 24th of May they went to see Mr. Willis again to see if he had gotten a plat of the property, and he said that Bouldin was to proceed at once to prepare a plat of his property, and that as soon as he got hold of it he would let them have it; that they then talked to him about the value of property in that section, quoting sales at different places, and told him he should name a different price for his property, but he still insisted that it was worth $250,000.00, "and that was his price for it." That plaintiffs reported to the Commission that same day, and they told them to continue negotiations with him.    That on the 25th of May they reported to the Commission the result of negotiations on the other properties involved, and were then told by General Leary that they thought they could assist the plaintiffs in their negotiations with Mr. Willis, and that they thought it was desirable for them to "see him, and show their hand, and explain the purpose for which the property was wanted; that the fact they would see him would not interfere with us, but would aid us; that this was a large city improvement and Mr. Willis was a prominent city official, closely affiliated with the administration and the fact of their seeing him they thought would tend to aid in the purchase of the property;" that he requested plaintiffs to see Mr. Willis and arrange for him to meet the Commission at the City Solicitor's office the next afternoon; that the plaintiffs called on Mr. Willis and told him that their principals desired to see him in regard to the property, and to meet him at the City Solicitor's office Saturday afternoon.    That they did meet, and that after the meeting plaintiffs were informed by the Commission that the statement Mr. Willis made to them was identically the same he had made to the plaintiffs, and that they did not see how it was possible for them ever to reach an understanding with Mr. Willis in regard to the property.    That afterwards plaintiffs saw Mr. Willis again, and told him that they would like very much to reach an understanding with him in regard to his property, "and desired to negotiate further;" that they asked him to give them another price, and he refused to do it, say-

ing "you are seeking to buy, I am not seeking to sell, it is your place to make an offer," that plaintiffs reported to the Commission on the 15th of June, and tried to get from them authority to make Mr. Willis an offer, but they thought it was entirely useless as their ideas and Mr. Willis' were so far apart that they didn't see how it was possible to reach an understanding with him. That this was the end of plaintiffs' negotiations with Mr. Willis.

Mr. Willis, who was called as a witness by plaintiffs, states that the plaintiffs came to see him several times at his office and once at the property; that they asked him how much land he had and he told them about 500 acres, and that if they represented somebody who had the right to take the property he would take $250,000.00 for it; that when he met the members of the Sewerage Commission at the City Solicitor's office, at the time mentioned by James C. Martien, he told those gentlemen the same thing he had told the plaintiffs. That the matter was not taken up again for sometime afterwards, and until he learned that they were about to proceed with condemnation proceedings in Baltimore County; that he was told by people in Baltimore County that they had been employed to go ahead, and that he then addressed a letter to General Leary, having first seen Mr. Hendrick, "and told him that I realized that the City had a right to take it; that it was by the grace of the State I owned it, and by its grace it could be taken away from me, and that the only thing we could dispute about would be the price. I did not dispute the right of the City to take it. The only thing about which we could honestly differ in connection with it would be the price. I proposed to settle it by a gentlemen's agreement rather than to trust to the condemnation juries of Baltimore County. He seemed to think well of that, but said he would have to submit it to his Commission, which was done. The Commission approved of it, and an agreement was prepared to submit it to arbitration, the agreement was signed, the arbitrators were appointed, the Commission met and decided the case. I remember General Leary saying he wanted the

paper drawn so there could be no delays in the matter, and wanted it final. If they had said ten dollars to me, I would have been bound to have taken it. I did not get as much as I thought I ought to have gotten, and do not think so now; but I am man enough to live up to a gentlemen's agreement when I make one."

It further appears from the evidence produced by plaintiffs that the agreement to submit to arbitration was executed on the 7th of February, 1907, and that the price fixed for the Willis property by the arbitration was $200,000.00. The only evidence offered by the defendant was the deed for the property from Mr. Willis to the City.

By the terms of the written contract entered into by the plaintiffs, and the Sewerage Commission in behalf of the City, the plaintiffs undertook to negotiate the purchase by the City of the property desired for the use of the Commission, for which services they were to receive not more than one and one-quarter per cent. of the aggregate amount of the purchases. In other words, the plaintiffs were employed as real estate brokers by the Commission, representing the City, to negotiate the purchase of the property needed by the Commission, and were to receive as compensation for such services not more than one and one-quarter per cent. of the entire amount of the purchases so made. Now in order to recover under this contract, which is clear and definite, it was necessary for the plaintiffs to show that the City, *through their efforts* and *negotiations,* in pursuance of the terms of the contract, had become the purchasers of certain property for the use of the Commission. The evidence in the case, which we have set out at length, and all of which was produced by the plaintiffs, shows conclusively that all negotiations and dealings between the plaintiffs and Mr. Willis ceased before the 15th of June, 1906, and that the efforts of the plaintiffs to negotiate the purchase of his property by the City had utterly failed; that both the plaintiffs and the Sewerage Commission had abandoned all efforts to secure and all hope of ever reaching an agreement with Mr. Willis in regard to the purchase

of the property, and that it was not until a long time thereafter, and until after Mr. Willis had heard that condemnation proceedings were about to be instituted for the purpose of condemning his property, that he went to the Commission himself, and offered to submit the matter to arbitration rather than undergo a condemnation proceeding.   Under such circumstances, the acquisition of the property by the City, whether it be regarded as a purchase within the meaning of the terms of the contract or not, was not in any sense the result of the negotiations of the plaintiffs.   The right of the plaintiffs to compensation was dependent upon the result of their negotiations.   If they failed, and by reason thereof the City was required to resort to other means of acquiring the property, upon what possible grounds can the plaintiffs expect to recover?   They did not render the service, viz, "negotiate the purchase," for which the City agreed to compensate them.   Their effort to do so may be commendable, but their failure defeats their right to recover.

In the early case of *Keener* v. *Harrod,* 2 Md. 70, the Court said: "We understand the rule to be this, that the mere fact of the agent having introduced the purchaser to the seller, or disclosed names by which they came together to treat, will not entitle him to compensation," unless it appears that such introduction or disclosure was the foundation on which the negotiation was begun and conducted, and the sale made.

And in the very recent case of *Walker* v. *Baldwin and Frick,* 106 Md. 634, this Court said: "All the cases agree that the disclosure of the purchaser's name and the putting of him in communication with the defendant by the plaintiff, must not only be the foundation upon which the negotiations were *begun,* but upon which it was *conducted* and the sale *ultimately made.* * * *   The broker must be shown to be the *procuring cause* of the sale.   The intervention of the plaintiff in beginning the negotiations, and their subsequent culmination in a sale will not suffice unless *those negotiations* were the ultimate cause of the sale."   In other words, to entitle a broker to recover commissions for the sale or purchase of

property, he must not only show his efforts or negotiations to accomplish the sale or purchase, but he must show that the sale or purchase was *accomplished as the result* of such efforts or negotiations.  As the plaintiffs in this case failed to show that the property was acquired by the City as a result of their efforts and negotiations, there was no error in the instruction of the Court to the effect that under the pleadings and evidence the plaintiffs were not entitled to recover commissions on the amount paid for the Willis lot.  Many other cases in this State might be cited, including the case of *Blake* v. *Stump,* 73 Md. 160, referred to by counsel for appellant, in support of the rule we have stated, but they are all so entirely in accord with the early case of *Keener* v. *Harrod, supra,* and the late case of *Walker v. Baldwin, supra,* from which we have quoted, that we deem it unnecessary to make further reference to authorities.  Nor is it necessary to discuss the cases referred to by the appellant, further than to say that we do not understand them as opposing the view we have expressed.  There is no doubt as to the meaning of the term "negotiate," in the contract in this case.  If we accept the definition in *Palmer* v. *Ferry,* 72 Mass. 420, cited by appellant, viz, that "To negotiate means to conclude by bargain, treaty or agreement," and apply it to the contract in this case, the plaintiffs contracted "to conclude by bargain, treaty or agreement" the purchase of the property, and it is their *failure to do so* in this case that defeats their right to recover.

The evidence objected to and excluded by the Court in the first exception, was evidence to show the negotiations of the plaintiffs in regard to property *other* than that purchased by the City.  The plaintiffs in their declaration claim commissions only on the property purchased, and do not make claim to any other commissions, therefore this evidence was not admissible under the pleadings, to which the Court was bound to look in determining the admissibility of evidence.

Finding no error in the rulings of the Court in the first exception, or in granting defendant's first prayer, it becomes unnecessary to consider the other questions presented by the record, and we must affirm the judgment below.

*Judgment affirmed with costs.*