# W. SCOTT WAY

*vs.*

# J. FRANK TURNER.

*Real estate brokers: commissions.*

To entitle a broker to recover commissions for the sale or purchase of property, he must not only show his efforts or negotiations to accomplish the sale or purchase, but he must show that the sale or purchase was the result of such efforts or negotiations.                            p. 329

*Decided January 14th, 1916.*

Appeal from the Circuit Court for Talbot County. (CONSTABLE, C. J., and ADKINS and HOPPER, JJ.)

The facts are stated in the opinion of the Court.

The cause was submitted to BOYD, C. J., BRISCOE, BURKE, THOMAS, PATTISON, URNER and STOCKBRIDGE, JJ.

*Alfred L. Tharp,* for the appellant.

*Joseph B. Seth, W. Mason Shehan* and *J. Frank Turner,* for the appellee.

STOCKBRIDGE, J., delivered the opinion of the Court.

This suit was brought to recover from W. Scott Way broker's commissions for the sale of his place on Miles River Neck. The plaintiff, J. Frank Turner, is a real estate broker in the town of Easton. Mr. Way placed in his hands for sale

a farm of some 96 or 97 acres on Miles River, and certain
of the stock and equipments of the place. The sale price
named was $22,000, upon which Mr. Way agreed to pay a
commission of 5%. Mr. Way appears to have also placed
the sale of the farm with a number of other real estate brok-
ers, and to have made independent efforts on his own account,
in connection with which he procured a number of cuts of his
place for the purpose of embellishing a circular which he had
prepared, and the use of which cuts he gave to Mr. Turner
in connection with a small book which Mr. Turner was get-
ting out to advertise the sale of sixty-five pieces of land in
Talbot County, which had been placed in his hands as broker.
The Way property was bought by a Mr. Hazard, and the
question which this case presents is, whether Mr. Turner was
the procuring cause of that sale. If so, he was entitled to
his commissions on the sale price, which was $20,000. If
he was not such procuring cause, then he had no claim
against the appellant.

The rule of law applicable to this description of cases has
been frequently announced in nearly every State in this
country, with some slight variations of phraseology. It is
concisely summed up in 4 *R. C. L.* p. 298, sec. 43, as follows:
"It is not enough that the broker has devoted his time, labor
or money to the interest of his principal, as unsuccessful
efforts, however meritorious, afford no ground of action. And
it matters not after his failure and the termination of his
agency what he has done proves of use and benefit to the prin-
cipal. In a multitude of cases that must necessarily result.
He may have introduced to each other parties who otherwise
would never have met; he may have created impressions
which under later and more favorable circumstances naturally
lead to and materially assist in the consummation of a sale;
he may have planted the very seed from which others reaped
the harvest; but all that gives him no claim. It was part of
his risk that, failing himself, not successful in fulfilling his
obligation, others might be left to some extent to avail them-

selves of the fruit of his labor. To entitle a broker to commissions upon a sale or transaction which is actually consummated he must show that his efforts and services were the primary, proximate and procuring cause thereof." And for this statement the author cites, among other cases, *Keener* v. *Harrod,* 2 Md. 70; *Tinges* v. *Moale,* 25 Md. 480; and *Blake* v. *Stump,* 73 Md. 160.

Numerous other Maryland cases might have been cited, such as *Livezy* v. *Miller,* 61 Md. 336, and *Hollyday* v. *Southern Agency,* 100 Md. 296. These are all collected and considered in the very elaborate opinion by JUDGE THOMAS in the case of *Martien* v. *Baltimore,* 109 Md. 260, where he says:

"In the early case of *Keener* v. *Harrod,* 2 Md. 70, the Court said, 'We understand the rule to be this, that the mere fact of the agent having introduced the purchaser to the seller, or disclosed names by which they came together to treat, will not entitle him to compensation,' unless it appears that such introduction or disclosure was the foundation on which the negotiation was begun and conducted, and the sale made. And in the very recent case of *Walker* v. *Baldwin,* 106 Md. 634, this Court said: 'All the cases agree that the disclosure of the purchaser's name, and the putting him in communication with the defendant by the plaintiff must not only be the foundation upon which the negotiations were *begun,* but upon which it was *conducted* and the sale *ultimately made.* * * * The broker must be shown to be the *procuring cause* of the sale. The intervention of the plaintiff in beginning the negotiations, and their subsequent culmination in a sale will not suffice unless *those negotiations* were the ultimate cause of the sale.' In other words to entitle a broker to recover commission for the sale or purchase of property, he must not only show his efforts or negotiations to accomplish the sale or purchase, but he must show that the sale or purchase was *accomplished as the result* of such efforts or negotiations."

A number of authorities were cited upon the briefs of the parties from outside of this State, but in view of the long line of decisions in Maryland upon this question, it is unnecessary to go beyond the adjudications of this Court.

The disputed question in the present case is, whether or not the appellee, J. Frank Turner, was or was not the procuring cause of the sale of the farm from Way to Hazard, and subordinate thereto the further question, whether the plaintiff produced sufficient evidence to entitle him to have this question passed upon by a jury, or whether it should have been taken from the jury by the Court, under the first prayer of the defendant.

The facts as testified to, intended to establish Mr. Turner as such procuring cause, were as follows:

Mr. Turner caused to be printed a small book listing sixty-five farms or pieces of land for sale, among which the farm of Mr. Way appeared as number 18; and the cuts illustrating Mr. Turner's booklet were those the use of which had been loaned him by Mr. Way. These books were then sent to all persons inquiring for farms in that section of the State, or to persons who Mr. Turner had any reason to believe might become so interested. One of these books came to the hands of a nephew of Mr. Hazard; Mr. Hazard was at that time in poor health, and looking for a farm in Talbot County, and friends of his in that county, were desirous that he should locate in the Trappe District of the county, in which they or some of them resided. Mr. Hazard together with his nephew and another gentleman went to Eastern and looked at several farms in the Trappe District, none of which suited Mr. Hazard. While on this visit the book of Mr. Turner was examined and consulted, and apparently as the result of such examination, Mr. Mullikin, a friend of Mr. Hazard called by telephone Mr. Turner for the purpose of making inquiry with regard to the farms Numbered 1 and 2 in Mr. Turner's catalogue and was informed that those had been sold. Mr. Turner then called the attention of Mr. Mullikin to the Way place, No. 18 of the Catalogue and the attention

of Mr. Hazard was thereby sought to be directed to it. This place, however, was on Miles Rives and not in the Trappe District. The extent to which Mr. Hazard may have been brought to consider the Way property through this telephonic communication to Mr. Mullikin is uncertain. Mr. Hazard himself positively denies that he was in any way influenced towards its consideration by reason of this communication. There is however, evidence given by a witness named Stevens, that Mr. Hazard talked with him with a view to having Stevens take him to see the Way property in an automobile which Stevens ran, which fact was communicated by Stevens to Turner; but it is equally clear that Stevens never did take Mr. Hazard to visit the place. Subsequently, at just what interval of time is not clear, Mr. Hazard was taken to the place by a man by the name of Walker and found it to his liking and he ultimately became the purchaser.

There is no dispute that Mr. Turner never saw Mr. Hazard until after the sale had been consummated; that he did not give the name of Mr. Hazard to Mr. Way as a possible or prospective buyer of the property, and while Mr. Turner has a recollection of having written to Mr. Hazard with regard to the place, that recollection is uncertain, no copy of any such letter is produced, and Mr. Hazard positively denies the receipt of such a letter. What Mr. Turner did may therefore be summarized in this manner—he did prepare a catalogue in which the Way place was described and illustrated and did so as the result of a contract or agreement with Mr. Way. A copy of this book in some manner came to the hands of Mr. Hazard. Mr. Turner did, by his telephone conversation with Mr. Mullikin endeavor to call Mr. Hazard's attention to the Way property, and he further, through Stevens, endeavored, though fruitlessly, to show the place to Mr. Hazard. Did these acts constitute the primary, proximate and procuring cause of the sale, so as to entitle Mr. Turner to claim commissions? Apparently, Mr. Turner was himself in doubt upon this question. In an interview

with Mr. Way, after Mr. Turner had learned that Mr. Hazard had purchased the Way farm, he said: "I told him furthermore I don't know who sold this farm; I know nothing about it or whether he bought it from you"; and a little later in his examination, in recounting his interview with Mr. Way, he used this expression: "The only dispute is whether I'm entitled to my commissions; that is what I am trying to find out. I want to see what testimony I have and what connection I have in regard to the matter." And at the conclusion of his cross-examination he was asked this question: "Q. Mr. Turner, will you explain to the jury in what other way, if any, you were instrumental in the sale of this farm to Mr. Hazard? A. I have told you all I know about it. Q. There is no other way in which you were instrumental in the sale of this farm? A. I have told you all." It is manifest that there was doubt in Mr. Turner's own mind whether he had been the procuring cause of the sale, and it is clear from the uncontradicted testimony that even if he were the primary means by which the attention of Mr. Hazard was called to the Way property, he was in no sense the proximate or procuring cause of the sale, and, therefore, it was error not to have granted the first prayer of the defendant and withdrawn the case from the consideration of the jury. The judgment appealed from must therefore be reversed.

> *Judgment reversed, without a new trial, the appellee to pay the costs.*