**ARTHUR H. RICHLAND COMPANY**

v.

**William R. MORSE.**

**Civ. A. No. 10515.**

United States District Court
D. Maryland,
Civil Division.

Jan. 28, 1959.

Norwood B. Orrick, Robert R. Bair, Venable, Baetjer & Howard, Baltimore, Md., for plaintiff.

Ralph W. Powers, Hyattsville, Md., for defendant.

CHESNUT, District Judge.

This is a suit by an agent or broker to recover commissions earned by him in accordance with a contract made with the defendant for the sale of the latter's great majority holdings (practically all) of the stock (8529 shares) of a Maryland corporation known as Maryland Electronic Manufacturing Company, the plant of which is situated at College Park, Maryland, a few miles from Washington, D. C. For brevity this corporation will be referred to as "Memco".

After the stock had been satisfactorily sold to Litton Industries, Inc., a California corporation, the plaintiff demanded payment of the commissions as provided for in the contract, but this was refused by the defendant with this suit resulting therefrom. The case has been heard non-jury on extensive testimony in court and certain depositions. It was orally argued by counsel at the conclusion of the case and supplemented by extended briefs for the parties. Upon all this I have considered the facts and law and will now, as briefly as possible, state what I believe to be the most important facts developed in the evidence making the findings largely as ultimate facts without prolonged discussion of particular supporting evidentiary facts. So far as possible I will state these findings chronologically.

1. First, as to who are the principal parties involved. The plaintiff, Richland, is an experienced broker for the sale and purchase of industrial business enterprises or the stock interest of parties therein. His principal office is in Chicago, Illinois, and as his business is by its nature largely national in scope, he has an Eastern representative, one Adelberg, whose office is situated in Jenkintown, Pennsylvania.

The defendant, Morse, some years ago started and has successfully operated for about ten years, a manufacturing enterprise known as "Memco" in this case, with a large capital stock of which he is practically the whole owner, the Company being engaged in the production of electronic instruments, including particularly antennae, in connection therewith. The Company has also had as one of its largest customers, the United States Government. In 1956, by reason partially of health, Morse decided to lighten his business activities by the sale of his stock interests in Memco which, at that time, he valued at something more than $2,000,000.

The Litton Company, which became purchaser of the stock, is a very large California enterprise with many branches distributed throughout the United States and in some foreign countries. Its products have been largely of electrical or electronic nature. Its growth to great proportions in output has been brought about in recent years very largely by its acquisition of smaller business enterprises of the same general nature. Prior to 1956 it had a branch of its business also situated in College Park, Maryland. This branch had previously been owned by William Ahrendt from whom Litton Company acquired it about 1955, retaining, however, for the time being, Ahrendt as its local representative and manager of the plant. Although Memco and the Maryland branch of Litton were close neighbors in College Park and not unfriendly in relation, there was no business affiliation of any kind between them prior to 1957. Executives of the Litton Company in California whose depositions have been taken in this case, were Charles Thornton, Ray Ash and H. W. Jamieson.

2. On May 21, 1956, Morse entered into a contract with Richland with regard to the prospective sale of the former's stock in Memco. The undisputed terms of the employment were as follows: "The plaintiff and defendant agreed that if the plaintiff was successful in producing a buyer ready and able to acquire defendant's stock for a consideration satisfactory to the defendant, the latter would pay the plaintiff a commission equal to five per cent of the first $1,000,000 of the consideration received by the seller, and three per cent of the should exceed $1,000,000." The agreement amount by which the purchase price

ment was not an exclusive one for Richland but it was contemplated that if a sale was successfully made the consideration might well be in stock of the purchaser.

In pursuance of this agreement Richland at once instructed Adelberg, the Eastern representative, to visit Morse in College Park and to obtain a full description of the nature, extent, volume and assets of the business, unfilled orders and other financial data relating to the value of the stock offered for sale. After carefully assembling all this data and obtaining an attractive brochure of Memco's business and plant including an important element of so-called "backlog" of unfilled orders, Richland, by reason of general business experience in such matters, made a list of prospective purchasers who might be interested. Among them he included the Litton Industries of California and on or about September 7, 1956 he brought the subject to the attention of Litton by correspondence. Although Litton had a Maryland branch also in College Park, this was the first information that Litton had that Memco might be for sale. Richland's communication with Litton was to Thornton, the President of Litton. The latter at once was interested and promptly instructed its local manager at College Park to make a visit to and submit his recommendations, if any, as to the desirability of acquiring Memco. Apparently Thornton did not communicate to Ahrendt the fact that the Memco property had been offered to Litton by Richland who had requested Thornton to communicate with him, Richland, directly with reference to the matter. Richland also at about the same time advised Morse that he had submitted the property to Litton. Ahrendt visited Morse after some little time, about November 1956, and advised Thornton or the Litton Industries that he, Ahrendt, felt Litton would not be interested in making a purchase because the price indicated (over $2,000,000) was, as Ahrendt thought, too high for the business at that time. Thereupon Thornton advised Richland that Litton would not be interested.

3. Despite this temporary lack of success with Litton, Richland continued actively to interest other prospective purchasers and on or before July 1957 he had succeeded in very much interesting the Stewart-Warner Corporation as a prospective purchaser. In the meantime, by virtue of correspondence by letter, or by telephone, Richland had apparently persuaded Morse that his asking price for the stock was much too high.

4. About October 1956 a Dr. Harvard Hull (who had previously been engaged in connection with the now well-known Manhattan project) became associated with the Litton Industries in California; and there is some evidence that there was some discussion between Thornton or other executives of Litton with Hull about the further development of the Maryland branch of Litton at College Park and the possible relation thereto, if any, of the acquisition of Memco, but apparently Hull was not advised at that time about Richland's prior relation to the matter. About March 1, 1957 Hull was appointed local manager at College Park of the Litton Industries. Both Ahrendt and Hull have testified as witnesses in the case. Their testimony seemed to me to be fair and unbiased. Neither of them is presently associated in any way with Litton. Dr. Hull's idea for the development of extension of the College Park business of Litton was quite clearly one of expansion with relation to the acquisition of Memco although he took no important steps with regard thereto until July 1957. The Maryland branch of Litton was engaged in the production of electro-mechanical instruments while the more particular business of Memco was electronic. Some time before July 1957 Dr. Hull, with some other representatives of Litton from California, made an extended inspection of Memco but without relation at the time at least to anything being said about the purchase.

5. We now come to a very important date and meeting between Richland and his associate Adelberg with Morse at College Park on or about July 16, 1957. The particular occasion for this meeting which also included a representative of Stewart-Warner Company as a prospective purchaser, was to discuss with Morse further details and negotiations regarding a possible sale to Stewart-Warner.

6. When Dr. Hull took over the management of Litton at College Park he learned from Ahrendt, his predecessor, that there was a possibility that Memco could be bought by Litton. On July 15, 1957 Dr. Hull went to see Morse (apparently without information as to the meeting of Morse with Stewart-Warner and Richland the next day) to have some talk with Morse about a possible purchase of Memco. On this visit he learned from Morse of the meeting arranged for Morse and Stewart-Warner the next day and with intimation from Morse that the latter expected to have a satisfactory and important offer for the purchase of Memco. Immediately Dr. Hull was greatly interested for some action to be taken by Litton and at once telephoned to Mr. Ash in California what the situation was, with the result that he had at least tentative authority from Litton to tell Morse in substance that he felt very sure that Litton would meet any offer made by Stewart-Warner.

7. The next day, July 16, 1957, Morse, Richland, Adelberg and Stewart-Warner representatives held their conference at College Park. It appears that a satisfactory price to Morse was offered by Stewart-Warner but there were some further details to be considered and no definite agreement was reached on that day. However, with this particular situation developing as it had and coming to a near climax, Morse had an important meeting thereafter on the same day with Richland and Adelberg and at that time Morse told Richland that he was very desirous of concluding an arrangement for the sale of the stock on the financial terms mentioned either with Stewart-Warner or with Litton. And I find from all the evidence that at that time Morse particularly told Richland that he, Morse, recognized him as the broker in the transaction for a sale either to Litton or to Stewart-Warner, and that Richland should continue his efforts to bring finally a sale to one or the other. In his testimony in court Morse in effect seemed to give the impression that he could not recall this particular arrangement but after carefully hearing, considering and weighing his testimony to the extent that it was in opposition to that of Richland and Adelberg, I find that Morse's testimony was uncertain and evasive and not acceptable to me as any contradiction of the continuing agreement and arrangement then made between Morse and Richland.

8. Thereafter, on July 22, 1957, Richland wrote to Ash of Litton in California again calling attention to the possibility of purchasing Memco and advising him that Morse would be willing to accept payment in stock of the Litton Industries and that he would in a few days telephone Ash at more length upon the subject. Ash did not respond in writing to Richland's letter and in the subsequent telephone conversation was in effect noncommittal with respect to Memco. However, it appears that shortly thereafter Morse informed Richland that a meeting was to be held with Litton representatives at College Park and that he, Morse, wanted Richland or Adelberg, his representative, to attend that meeting and to continue negotiations. Adelberg subsequently on several occasions unsuccessfully tried to learn from Morse just when this meeting was to be held and expressing his intention to attend. Such a meeting between Morse and Litton did shortly thereafter occur and it is a reasonable inference from all the evidence in the case, and I find, that as a result of that meeting it appeared imminent and highly probable that a satisfactory sale would be consummated. Shortly thereafter it further appears that Morse made a personal visit to Litton in California. As a result of these

latter and direct negotiations between Morse and Litton a contract of sale was entered into on September 14, 1957 by Morse to Litton whereby Morse was to receive two shares of Litton common stock for each share of his Memco stock. Pursuant to this understanding, and as stipulated at the trial, on January 21, 1958 Morse received 17,058 shares of Litton stock (in exchange for his 8,529 shares of Memco) which had a then market value of $42.25 per share, making an aggregate value of $720,700.50. As "additional consideration" on October 1, 1958, Morse received $150,000 worth of shares of Litton stock, making a total consideration paid to date of $870,700.50, on which the plaintiff requests a money judgment for his commission of $43,535.02. At least an additional $300,000 worth of Litton stock is to be paid to Morse in two equal installments on October 1, 1959 and October 1, 1960, on which the plaintiff requests a declaratory judgment for the agreed upon percentage when the additional stock is received by Morse. Morse did not inform Richland or Adelberg with respect to these negotiations; nor did he directly inform Richland of the sale when made. On the contrary I find that after the practical success of the negotiations for the sale to Litton had been authorized by Morse, he intentionally was evasive with respect to Richland and kept him in ignorance of the later developments although he had previously expressly agreed with and engaged Richland to continue negotiations on Morse's behalf with Litton as well as with Stewart-Warner which, prior to the sale by Morse to Litton, had been discontinued by reason of Morse's unwillingness to continue for a time after such sale to manage Memco for Stewart-Warner.

9. I also find as a reasonable inference from all the evidence in the case that in these final stages of direct negotiations between Morse and Litton from which Richland was intentionally excluded, Litton belittled and discouraged the idea of Richland having been effective as a broker in the negotiations but nevertheless Morse required, as a condition of making the sale to Litton, that the latter would reimburse Morse for any commission that he was legally obliged to pay to Richland.

10. Richland first learned of the sale to Litton from the Wall Street Journal about October 15, 1957 and at once thereafter wrote to Morse making claim for the commissions in the case in accordance with their agreement.

11. Morse did not at first deny that the commission was due to Richland but in a rather evasive way indicated that the time for further talk about commissions should be postponed until the sale had been finally consummated by delivery. Later in January 1958 Morse wrote Richland saying " * * * It is not clear to me just how strong a position you occupied in the relationship between Litton and Memco. * * * Thus it appears that the proposed acquisition of Memco by Litton Industries did not result from your efforts but more directly from the observations and recommendations of Dr. Hull. * * * ". And this belated reply of Morse to Richland's claim is now the position taken by counsel for Morse in the defense of this suit; that is to say, that Richland was not the procuring cause of the sale because the sale was due to the interposition of Dr. Hull's view as to the advisability of the purchase of Memco by Litton. It is sufficient to say right here that on July 16, 1957 Morse well knew of Dr. Hull's intervention in the matter but nevertheless particularly engaged Richland to continue his active efforts on behalf of Morse in effecting a sale as broker whether to Litton or Stewart-Warner.

12. As the parties to this case were geographically widely separated, much of the negotiations had to be conducted by correspondence and telephone. The whole evidence in the case consists of this correspondence which can best be read chronologically, and more importantly also by the direct testimony of the particular witnesses in court including Ahrendt, Hull, Richland, Adelberg and Morse, and the depositions of Thornton,

Ash and Jamieson, executives of Litton. In substance, I think it all comes down in its residual analysis to a comparatively simple situation as between Morse as principal and Richland as agent. The agent was employed on certain terms to effect a sale of Morse's stock; the agent by virtue of experience was able to find and introduce to Morse a possibly interested prospective purchaser; while negotiations with that purchaser were not at first and for some time successful, the agent continued diligently to find another purchaser; he did find another prospective purchaser who tentatively offered a sum satisfactory to Morse; when this was learned by Litton it expressed willingness to meet any offer made by Stewart-Warner; thereupon Morse told Richland to continue his efforts as broker with both prospective purchasers and Richland actively did so to the extent that he was permitted by Morse and Litton; thereafter when success in the sale to Litton was practically assured Morse evasively excluded the broker from further activity in the actual consummation of the sale. In effect, therefore, the principal discharged the agent after he had faithfully performed his duties, took the matter for final consummation into his own hands, and reaped the benefits of the agent's services, but repudiates his obligation to the agent as agreed upon. Therefore when success was practically assured the principal without justification attempted to discharge the agent and deny him compensation. This is inequitable conduct.

The burden of proof is, of course, on the plaintiff to show that he was the procuring cause of the sale. On the whole evidence, I conclude that he has justly and reasonably done so and that he is entitled to commissions in the amount agreed upon.

As the jurisdiction of the court depends solely on diversity of citizenship the Maryland law is controlling. The simple issue in the case is whether under all the facts and circumstances found from the evidence the plaintiff broker can reasonably and properly be held to have been the *procuring cause* of the sale. There have been very many illustrative cases in the Maryland Court of Appeals in which it has been determined under the particular facts and circumstances of the case whether the broker was the procuring cause of the sale; but neither counsel nor I have found any of the Maryland cases sufficiently analogous on the facts to be helpful in deciding this question here on its particular facts, except for the application of the general principle that the broker must have been the procuring cause.

A very succinct statement of the principle, where the case is not affected by any local statute or unusual terms of contract between the owner and the broker, can be found in A.L.I. Restatement of Agency, s. 448, which reads as follows: "S. 448: Compensation; Agent as effective cause. An agent whose compensation is conditional upon his accomplishment of a specified result is entitled to the agreed compensation if, and only if, he is the effective cause of accomplishing the result." "Comment a: Meaning of effective cause. An agent is an 'effective cause' as that phrase is used in this section, when his efforts have been sufficiently important in achieving a result for the accomplishment of which the principal has promised to pay him so that it is just that the principal should pay the promised compensation to him."

This statement of the A.L.I. has been cited with approval in at least two Maryland cases dealing with somewhat similar subject matter. Mayhew v. Meehan, 176 Md. 599, at page 604, 6 A.2d 223, page 225, and Bowie v. Martin, 199 Md. 58, at page 67, 85 A.2d 786, at page 790.

In determining whether the broker has been the procuring cause of the sale it is not requisite, where the plaintiff's evidence is otherwise sufficient, that the broker should have been present at the final consummation of the sale, or to have directly and immediately have been the final negotiator therefor. Thus, where the broker has introduced to the seller a prospective interested buyer and

negotiations have progressed to a point where success seems imminent, the broker cannot be deprived of his commissions because the seller in effect bypasses the broker by direct negotiations with the buyer, in effect freezing the broker out of the case. There are a number of Maryland cases, early and late, which so hold. Kenner v. Harrod & Brooke, 1852, 2 Md. 63; Jones v. Adler, 1871, 34 Md. 440; Baltimore Car Wheel Co. v. Clarke, 1917, 131 Md. 513, 104 A. 357; Warshawsky v. Traub, 1929, 156 Md. 597, 144 A. 833; Steele v. Seth, 211 Md. 323, 127 A.2d 388 (1956, opinion by Chief Judge Brune). Other Maryland cases dealing with the general subject matter as to what circumstances are or are not sufficient to show what was the procuring cause, including those cited by counsel for the defendant in this case, are Martien v. Mayor & City Council of Baltimore, 109 Md. 260, 71 A. 966; Walker v. Baldwin & Frick, 106 Md. 619, 68 A. 25; Way v. Turner, 127 Md. 327, 96 A. 676. See also Hollyday v. Southern Farm Agency, 100 Md. 294, 59 A. 646; Livezy v. Miller, 61 Md. 336.[1]

The contention of the defendant is that the broker was not the procuring cause of the sale in this case because while he first introduced a prospective purchaser, the latter disclaimed further interest at the time and this was a complete break in the negotiations which were later revived only by the alleged independent intervention of a new manager for the Maryland branch of Litton Industries, Dr. Hull, and that all subsequent negotiations were based on this new intervening cause. However plausible this view of the matter may have seemed to busy executives of Litton Industries, whose volume of business had been built up largely by the acquisition of many smaller industries, I do not find that this view would be just and reasonable in this case under all the evidence. In the first place, what Dr. Hull contributed was not as a representative of the seller as he was in fact an executive of the buyer. In that respect there would have been no difference if Thornton or Ash or Jamieson, superior executives in California, had changed their minds about the purchase. Hull's relation to the matter was simply an advisory one to his employer, Litton Industries. Irrespective of the origin of the revival of the interest of Litton, the fact is that their interest was revived as a purchaser; and we must look to the evidence to see what further happened when it was so revived.

More particularly it must be remembered that' the broker's claim here is directly against Morse, the defendant. The first expression of this revival of interest by Litton was on July 15, 1957 when Hull called upon Morse. And it is important to remember that immediately prior thereto Richland by his active continued efforts had produced another prospective purchaser, Stewart-Warner, and

---

[1] In a recent case in this court, Fernando R. Sari v. West, D.C., 160 F.Supp. 390, I had occasion to examine most, if not all, of these Maryland cases but, as previously heretofore indicated, the facts are not in themselves analogous to the present case. I note also an early Maryland statute upon the subject of brokers' right to compensation, Art. 2, § 17, Maryland Ann.Code of 1957, which, however, seems in substance only declaratory of common law principles and has no particular application here.

"S. 17. When real estate broker entitled to commission. Whenever, in the absence of special agreement to the contrary, a real estate broker employed to sell, buy, lease or otherwise negotiate real or leasehold estates or mortgages, or loans thereon, procures in good faith a purchaser, seller, lessor or lessee, mortgagor or mortgagee, borrower or lender, as the lease (case) may be, and the person so procured is accepted as such by the employer, and enters into a valid, binding and enforceable written contract of sale, purchase, lease, mortgage, loan or other contract, as the case may be, in terms acceptable to the employer, and such contract is accepted by the employer and signed by him, the broker shall be deemed to have earned the customary or agreed commission, as the case may be, whether or not the contract entered into be actually into (in) effect, unless the performance of such contract be prevented, hindered or delayed by any act of the broker."

had arranged a meeting between Morse and Stewart-Warner, Richland and Adelberg at College Park for July 16, 1957. In the meantime during the many months of activity of Richland in conference with and advice to Morse, the latter's asking price was materially reduced from about $2,000,000 to about $1,000,000; and it appears that Stewart-Warner was about ready to meet the latter's price. The communication by Morse of this fact (which was clearly due to the active efforts of Richland) spurred the Litton Industries at once into renewed activity and by hurried telephone conversations between Hull and California the former was authorized to indicate to Morse that any offer by the other prospective purchaser would be met by Litton. With full knowledge of this particular situation, Morse instructed Richland to continue his efforts to make the sale as his broker, to one or the other of these prospective purchasers so that a sale could be effected. This Richland at once acted on but found that Litton was non-committal as to him; but nevertheless promptly thereafter Litton by-passed the broker whom it knew to be the representative of Morse, by arranging meetings directly with Morse and with the latter's cooperation and thus ignoring the broker and evasively freezing him out of further negotiations.

In considering a set of circumstances to determine what was the procuring or proximate cause of a sale, it is necessary to look at the evidence as a whole and particularly the relation and activities between the seller and the broker. In determining the causal connection, the reasoning is often analogized to the separate connecting links of a chain more or less in a straight line. But at times to properly determine causation the analogy, as I think was once remarked by an English Admiralty Judge, is more properly thought of as a net rather than as a simple chain. The meshes of the net represent contributing factors in the problem of causation, some parallel, others transverse and still others concurrent. And of course it is well known that in searching for the proximate cause of a final event there may be several concurrent causes. In the instant case there were various contributing factors leading to the final event. One important one was the lowering of the price by Morse; another was the more receptive attitude of Litton on the advice of Hull; still another very important factor was the production by Richland of Stewart-Warner. In my opinion, looking at the various cooperating causes, the most important single feature toward reaching the final result was Richland's production of Stewart-Warner and the communication of the situation to Litton. It was the vital spark which ignited Litton's dormant interest into a blaze of activity to make the purchase.

In addition to this, we must also consider the instructions of Morse to Richland on July 16, 1957 to continue his activities as broker, which then had strong indications of success with respect to one of the two prospective purchasers. Richland promptly acted accordingly but could get nowhere, as a broker, with Litton although the latter was interested in buying by direct negotiations with Morse. And Morse, without advising his broker, permitted this to be done to the exclusion of the broker. Under such circumstances I think the practical discharge of the broker was legally unjustifiable and that he can properly and justly be considered in this case to have been the procuring cause of the ultimate sale.

It may have been natural for the Litton executives in California to think that their important (if somewhat belated) decision to buy Morse's stock completely overshadowed any contribution by the Chicago broker to the result, but it is important to remember that Richland's claim is against Morse, not Litton; and it is very significant with respect to Morse's knowledge and understanding of his relations with Richland that when Morse agreed to sell to Litton, he required a separate agreement from Litton that it would reimburse him for Richland's commission if he was obliged to pay it; and it is further significant

of Morse's evasive attitude toward Richland in making the sale to Litton directly that as late as the latter part of January 1958, Morse falsely told Richland in response to the latter's direct inquiry, that he had not taken an indemnity agreement from Litton.

I conclude that the plaintiff is entitled to a judgment for the amount of commissions earned in accordance with his agreement with the defendant, to wit, 5 per cent of the amount of the consideration heretofore actually received by Morse (calculated by plaintiff's counsel as now amounting to $43,535.02) up to the present time; and to a declaratory judgment that he will be entitled to further commissions at the rate agreed upon on additional consideration hereafter, if and when received by Morse. Counsel are requested to promptly submit for consideration the precise form of judgment to be entered.

