### TAHIR ERK v. GLENN L. MARTIN CO.
### No. 242.

District Court, D. Maryland.

April 20, 1940.

Helen Sherry, of Baltimore, Md., for plaintiff.

Semmes, Bowen & Semmes, of Baltimore, Md. (William D. Macmillan and W. Randall Compton, both of Baltimore, Md., of counsel), for defendant.

WILLIAM C. COLEMAN, District Judge.

The plaintiff has sued the defendant for breach of a contract whereby defendant engaged the services of the plaintiff as its representative in Turkey, for the purpose of assisting it in selling military aircraft to the Turkish Government.

The statutory requirements, incident to the right to invoke this Court's jurisdiction, are satisfied.

The suit is now before the Court on defendant's motion to dismiss it, on the ground that the complaint fails to state a

claim upon which relief can be granted. So, for present purposes, the facts as alleged in the complaint are to be treated as true.

The contract is embodied in three letters, annexed to the complaint, and in others referred to therein, which disclose the salient features of the agreement to be as follows: By letter dated August 22, 1930, and sent from Baltimore, defendant offered to appoint a Turkish company known as Erdogan Limited, of Constantinople, its exclusive agent in connection with contemplated sales of aircraft to the Turkish Government, the appointment to be for an indeterminate period of time, and cancellable by either party upon sixty days written notice. Commissions to the agent were to be at the rate of 5% on "business secured" by the agent for the defendant, due and payable when defendant was fully paid for completed and delivered orders; and in the event defendant cancelled the contract according to its terms, these commissions were payable to the agent upon any "business" which it might have "instigated prior to date of said cancellation, providing said business is closed by us within six months" after such cancellation. Right was reserved by the defendant to carry on, at any time, negotiations direct with the Turkish Government, "if in our opinion our mutual interests can be better served by our doing so;" but in the event such direct dealings took place while the agreement was still in force, defendant obligated itself to furnish the agent with copies of all relevant correspondence.

The agency appointment was accepted upon the stipulated terms by Erdogan Limited, by letter dated October 4th, 1930, sent from Istanbul, and with an additional proviso, which was accepted by the defendant in its reply dated October 25, 1930, namely, that so long as the agreement was in force, defendant obligated itself not to enter into any agreement with any other firm in Turkey, for the purpose of carrying on negotiations looking towards the procurement of aircraft manufactured by defendant.

Summarizing the other allegations of fact in the complaint, for about a year and a half after the agreement above was entered into, Erdogan negotiated with various officials of the Republic of Turkey for the purchase of military aircraft from the defendant. But no contract was ever executed during this period, and in April, 1932, Erdogan Limited went into liquidation and discontinued business; and the plaintiff, who had been a co-owner of this company, succeeded to and carried on its business, and as such successor was recognized and accepted by the defendant with respect to all the rights and obligations of Erdogan Limited, under the agreement just explained.

Thereafter, plaintiff continued to act as defendant's agent and pursued negotiations with the Turkish Government, until in July, 1933, defendant gave plaintiff written notice of cancellation of the agency agreement, stating as its reason that it had entered into an agreement with the United States Government not to export, or to enter into negotiations for the sale of military aircraft to any foreign country, and to keep secret all specifications relating to such aircraft, until permitted by the United States Government to do otherwise. However, as the result of further correspondence and plaintiff's request that defendant withdraw its notice of cancellation, defendant did so, and it was understood that plaintiff should, and did continue to act as defendant's agent until June 14, 1935, when defendant cabled plaintiff, cancelling the agency appointment. It appears that at the time of this cancellation, plaintiff was engaged in active sales negotiations with officials of the Turkish Republic which was prepared to purchase military aircraft from defendant as soon as defendant was willing and able to sell. About a year later, that is, in June, 1936, the United States Government removed the restriction that it had placed upon the defendant against selling aircraft to the Turkish Government, whereupon defendant advised that Government that it was now in a position to sell to it, and, as a result, in December, 1936, the defendant received an order in excess of $2,000,000 for military aircraft, which was completely filled and full payment was received by the defendant prior to the institution of the present suit, although it is not disclosed how long it was, after receipt of the order, before the entire matter was completely consummated.

It will be seen that, by the terms of the contract, upon notice of termination being given, the agency was to continue for sixty days thereafter, and commissions were to be payable upon any business "instigated prior to date of said cancellation, providing said business is closed by us within six months" after such cancellation. That is to say, there was a total ad-

ditional period of eight months allowed to the plaintiff during which his right to commissions might vest. The word "closed" is to be taken as having been used in the contract in its generally accepted business sense, namely, as describing a situation in which the parties had reached an agreement; that is, where the parties had actually contracted with each other, the one to sell and the other to buy. It is obviously not used in reference to "completion" as opposed to "execution" of a sales contract. The agency agreement between the plaintiff and the defendant, has, as we have seen, an additional clause providing that such commissions as plaintiff may be entitled to shall be due and payable when defendant has been "fully paid for completed and delivered orders." Obviously, a sales contract of the sort contemplated would be "closed," that is, executed, long prior to the actual completion and delivery of the airplanes covered by the contract.

Summarized, the specific basis of defendant's motion to dismiss the action because the complaint fails to state a claim upon which relief can be granted, is that the contract between the parties contains no promise, express or implied, on the part of the defendant (1) to compensate plaintiff for his services unless the defendant actually executed a sales contract or contracts with the Turkish Government; or (2) to execute any such contract; and that, therefore, since the defendant had the right to revoke, and did revoke the contract before it executed any such contract, defendant owes plaintiff nothing. In other words, defendant claims that it had the right to sell or not to sell to Turkey as it saw fit; and that since it did not agree to sell until December, 1936, about sixteen months after its notice of cancellation to the plaintiff became effective, and about ten months after the additional six months period provided for in the contract had expired, there has been no breach of the contract either in giving the notice or in refusing to pay commissions to plaintiff, because none have been earned under the contract.

The reply of the plaintiff to defendant's contention is twofold, and may be summarized as follows: (1) Plaintiff is in the position of an agent to whom his principal has made a revocable offer of compensation upon the accomplishment of a specified result by reason of the agent's efforts, and the latter is entitled to such compensation where the principal, in order to avoid payment, revokes the offer and thereafter the specified result is accomplished, the agent's efforts being the effective cause of such accomplishment; and (2) the ban or embargo by the United States Government against shipment of airplanes to Turkey operated to suspend the entire agency agreement between the parties, resulting in the suspension of the cancellation right therein reserved to the defendant; and that, therefore, the extra eight months' period allowed the plaintiff after the defendant's exercise of the cancellation right, did not begin to run until the ban was removed.

■ The contract between plaintiff and defendant is controlled by the law of Maryland, since it was made in Maryland when defendant mailed its letter of final acceptance of October 25, 1930.

■ An examination of the Maryland decisions—although there appears to be none involving facts parallel with those in the present case—supports the position taken by the defendant, namely, that there has been no breach of the contract by the defendant and that, therefore, plaintiff is entitled to no relief. The closest analogy in the reported Maryland decisions is that involving agreements with real estate brokers. The Maryland law governing agreements of this kind, as well as agreements with other types of brokers, is clearly stated in Cleaves v. Sharp & Dohme, Inc., 166 Md. 546, 171 A. 374. There, a broker sued a corporation and its president and controlling stockholder who had requested the broker to develop and furnish details of a plan proposed by him for the consolidation of the corporation with another company. The defendants approved the plan, directed the broker to proceed with his efforts to effect the consolidation and encouraged and accepted his services and efforts. The Court held, however, that the broker was not entitled to recover because he had not been a party to procuring the result for which he was employed, although this result was later effected by others. That is to say, the Court held that where a broker is given merely an opportunity to earn commissions by procuring the result, as when property to be sold is listed with him, the broker has no rights against the principal unless and until he procures the result before his opportunity or agency is revoked by the principal, which revocation may, if authorized by the agency agreement, take place at any time

without imposing liability upon the principal, provided only that this right of revocation may not be exercised for the purpose of depriving the broker of compensation that has actually been earned.

In the Cleaves case, the Court thus stated the controlling principles (166 Md. at pages 551, 552, 171 A. at page 376):

"An intermediary may, of course, be used in the negotiation of a contract or a dealing of any kind in any one of a variety of ways or upon any terms the principal and the intermediary agent may choose. They may agree merely that the agent shall do work for the principal in an effort to accomplish the result sought, with remuneration to be paid whether the result is accomplished or not. That is a familiar basis of employment of attorneys at law. And it may be arranged by express contract, or the obligation to pay may be implied from circumstances from which an expectation of payment may be inferred. Brantly, Contracts, (2d Ed.) 21; Page v. Penrose, 147 Md. 225, 127 A. 748. On the other hand, the arrangement may be that the agent is to earn compensation only by procuring the result. And that is the ordinary arrangement with commission agents and brokers. Commissions to be earned by them are ordinarily to recompense them for all efforts and outlays, and they are expected to go without that recompense if they do not procure the result. A broker has not a contract, strictly speaking, but only a promise from the other party to pay for the performance of an act. Brantly, Contracts (2d Ed.) 44; 2 Mechem, Agency, § 2482, note; [A.L. Inst.] Restatement, Agency, § 1, d; Attrill v. Patterson, 58 Md. 226; Hill v. Iglehart, 145 Md. 537, 547, 549, 550, 125 A. 843.

"If the parties wish, they may agree, contrary to the usual practice, that even such a broker shall receive compensation for unsuccessful efforts, or the broker may recover on a quantum meruit or implied contract if his efforts have been contributed under circumstances from which expectation of paying may be inferred. Harper v. Davis, 115 Md. 349, 353, 80 A. 1012, 35 L.R.A.,N.S., 1026, Ann.Cas.1913A, 861; Attrill v. Patterson, 58 Md. 226, 255; 43 A.L.R. 1122 note; Barnett v. Isaacson, 4 T.L.R. 645; Elliott v. Kazajian, 255 Mass. 459, 461, 152 N.E. 351.

"The brokers who earn compensation only on procuring a result may be utilized on materially different terms. They may be given merely an opportunity to earn the commission by procuring the result, as when property to be sold is listed with a broker; and in such case a broker has no rights against the principal unless and until he procures the result before his opportunity or agency is recalled by the principal. Martien v. Baltimore, 109 Md. 260, 269, 71 A. 966; Way v. Turner, 127 Md. 327, 328, 96 A. 676; Hill v. Iglehart, supra, page 549 of 145 Md., 125 A. 843. Or, on the other hand, they may by contract upon consideration, be given exclusive rights to negotiate, or sell, or any other rights the parties may decide upon. Elliott v. Kazajian, supra. Except so far as the principal may, by contract, have parted with that freedom, the rule is that he may revoke the agency or authority at any time, with the qualification that he cannot make use of that power to cut off compensation from a broker who has earned it. Hill v. Iglehart and Martien v. Baltimore, supra; Singer Co. v. Goldsborough, 147 Md. 628, 636, 128 A. 754; Howard v. Street, 125 Md. 289, 300, 93 A. 923."

Parenthetically, it is appropriate to point out that prior to 1910 (Annotated Code of Maryland, Article 2, Section 17) the rule in Maryland was that a real estate broker was not entitled to commissions from a principal, the vendor, if the purchaser procured by the broker failed or refused to pay the purchase money even though a binding contract of sale had been executed by the vendor and the purchaser, and the agreement between the vendor and the broker was that the latter should undertake to produce a party ready, willing and able to buy. See Riggs v. Turnbull, 105 Md. 135, 66 A. 13, 8 L.R.A.,N.S., 824, 11 Ann.Cas. 783; Schapiro v. Chapin, 159 Md. 418, 151 A. 44.

The rule in Maryland governing the typical real estate broker's situation is stated as follows in Hill v. Iglehart, 145 Md. 537, pages 550, 551, 125 A. 843, page 848, a decision referred to in the Cleaves case, supra: "The general rule is that the principal may at any time before the broker finds a purchaser ready, able, and willing to buy the property upon terms satisfactory to the principal revoke the agency (9 C.J. 563), and that, where such revocation is untainted by fraud or bad faith, the broker will not be entitled to commissions, even though the principal, after the revocation, sells the property to a purchaser with whom the broker had been negotiating and not-

withstanding that the broker's efforts may have been the direct and procuring cause of such sale. Howard v. Street, 125 Md. 289 [302], 93 A. 923; Attrill v. Patterson, 58 Md. 226; Beale v. Creswell, 3 Md. [196] 201." See also, Williston on Contracts, Rev.Ed., Sec. 1030A; and Secs. 60A and 1027A.

■ In the present case, the arrangement made was not for any specific time, and power to revoke at any time was expressly given to both parties. In the typical real estate broker's contract .such as that construed in Hill v. Iglehart, supra, the principal's power of revocation was, implied in law, the same. Therefore, to this extent the two situations are similar. However, there is a basic distinction between the real estate broker's case and the present one, namely, in the former, the principal is obligated to pay the broker his commissions upon the latter accomplishing certain things, regardless of whether the principal ever enters into a contract of sale; whereas in the present case, the principal, that is the defendant, is obligated to pay the broker nothing unless he, the defendant, actually contracts to sell; and the defendant is under no obligation whatsoever to sell or to contract to sell. In other words, the contract in issue contains no obligation—no promise, express or implied —on the part of defendant to sell any aircraft whatsoever to Turkey, even though Turkey might be ready, willing and able to purchase aircraft, and might have been induced so to do directly and solely by the efforts of the plaintiff; and there is nothing in the contract whereby defendant bound itself to compensate plaintiff for his efforts unless and until it, the defendant, did actually enter into a contract of sale with the Turkish Government. A fortiori, plaintiff's agency relationship, as defined in the contract with defendant, gave plaintiff no interest, no vested right, in the profits which defendant might derive from contracts with the Turkish Government. As it turned out, plaintiff may have been shortsighted in not requiring more specific provision for his own protection, in the event of termination of the agency agreement under circumstances such as those before us. However, such shortcomings do not entitle him to have a Court retroactively read into the contract the omitted provisions. Plaintiff did not earn any commissions—his right to commissions did not vest—except upon "business" that was "closed" by the defendant within the stipulated period, following cancellation by the defendant; that is to say, only if defendant actually entered into a contract with the Turkish Government within such stipulated period of time. Such did not occur and therefore the defendant, unlike the principal in the typical real estate broker's case above referred to, was obligated to pay the agent nothing for his services. In other words, the specified result upon the accomplishment of which, in the real estate broker's case, the broker is entitled to his commissions, is the production of the person with the stipulated buyer's qualifications; whereas in the present case, the specified result which was made a condition precedent to the agent's earning commissions was the actual execution of a contract of sale by the principal with the third party. It is true that the contract, in fixing the amount of commissions, states that they shall be the same as those on "business secured" by its agents generally, but the word "secured" as thus used cannot be given a meaning that will over-ride the unambiguous provision, earlier set forth in the contract, defining upon what "business" commissions are to be payable, in the event of cancellation, under this particular contract.

■ The conclusion here reached is entirely consistent with Section 454 of the Restatement of the Law of Agency, as follows: "An agent to whom the principal has made a revocable offer of compensation if he accomplishes a specified result is entitled to the promised amount if the principal, in order to avoid payment of it, revokes the offer and thereafter the result is accomplished, the agent's prior efforts being the effective cause thereof." In the Restatement Comment on this principle, it is explained that if the agent is on the verge of success and but for the aleatory element in the transaction he would be entitled to practically full compensation for his services, the rule is necessary in order to prevent sharp dealing; it being further explained that under such conditions, if the principal attempts to revoke his offer to the agent, intending thereby to take the benefit of the agent's services without paying for them, he acts in bad faith; and under such a condition specific reparation is afforded the agent by disregarding the revocation and determining his rights to the promised compensation as though no revocation had been made.

The Restatement comment goes on to explain that: "The typical situation for the application of the rule is that in which a broker or other intermediary has so nearly succeeded in procuring a customer or completing a transaction that the principal believes he can perform the rest of the transaction without further assistance or expense. If, in this case, the principal terminates the agency, either to save for himself the broker's commission or to let the buyer or another agent have it, the broker is entitled to the agreed compensation."

Section 445 of the Agency Restatement provides as follows: "Except where there is revocation in bad faith, in which case the rule stated in Section 454 is applicable, an agent whose compensation is conditional upon the performance by him of specified services, or his accomplishment of a specified result, is not entitled to the agreed compensation unless he renders the specified services or achieves the result." And Section 446 provides that: "An agent whose compensation is conditional upon his performance of specified services or his accomplishment of a specified result within a specified time is not entitled to the agreed compensation unless he renders the services or achieves the result within such time, except where the principal, in bad faith, has prevented him from doing so." This rule is but a clarification of the one previously quoted (Section 445). In the comment upon Section 446 is the following: "The broker may protect himself by requiring an agreement that he is to receive his compensation if he produces a customer who enters into negotiations with the principal within the specified time and subsequently completes the transaction."

We accept the above as correct principles, and we find the Maryland law to be in conformity therewith. Also, we find such cases as Weisels-Gerhart Real Estate Co. v. Epstein, 157 Mo.App. 101, 137 S.W. 326, upon which plaintiff relies, announce no different principle, and are consistent with our conclusion in the present case. Plaintiff contends that the cancellation of the contract by defendant should not be allowed to become effective without compensating plaintiff on the basis of commissions on the sale of airplanes subsequently made by the defendant itself to the Turkish Government, since such cancellation was for the very purpose of depriving plaintiff of just rewards for his efforts in instigating such sale—in other words, that it was in bad faith, fraudulent—the type of case that Section 454 of the Restatement, just quoted, covers. But obviously *any* cancellation under the contract *might* deprive the plaintiff of commissions on future business. In the interest of fair dealing with the plaintiff, and to prevent cancellation within limits on the eve of expected business, the contract provides for the payment of commissions on any business closed by the defendant within six months after the effective date of cancellation and instigated by the agent prior to cancellation. That the present situation was not actually foreseen by the plaintiff and expressly provided for in the contract, does not make the defendant's conduct equivalent to bad faith. The United States Government ban against sales of aircraft to the Turkish Government had been in existence two years, less approximately one month, prior to defendant giving notice of cancellation and had continued for another year, all of which was well known to the plaintiff. Nevertheless, plaintiff contends that because defendant knew on June 14, 1935, when it gave notice of cancellation, that at its, defendant's, request, the Department of State, United States Government would lift the ban, therefore, the cancellation was for the deliberate purpose of depriving plaintiff of commissions on the sales which he had instigated and which, but for the cancellation, he would have earned under the contract.

It is true that plaintiff would have been entitled to commissions on the sale that was "closed" in December, 1936, if the cancellation in controversy had not taken place or if, by some other cancellation, plaintiff's rights had not been cut off, but it by no means follows that defendant had no right to cancel as it did. As already stated, plaintiff contends that the cancellation should not be allowed to operate to defeat the payment of commissions since, as the complaint alleges, and as we must assume to be true, on the present state of the pleadings, at the time of cancellation our Government would, at defendant's request, have lifted the ban which would have accelerated consummation of the negotiations which plaintiff had progressed, yet, defendant withheld such request until after cancellation, and until the extra period, within which the right to commissions might arise, had expired under the contract. The fallacy of this contention is apparent for two reasons: (1) There is noth-

ing in the contract requiring the defendant to request that the ban be lifted; and (2) the lifting of the ban bore no such proximity, in point of time, to either the date of cancellation or the actual execution of the sales agreement with the Turkish Government, as to support the charge of bad faith or fraud. In other words, such argument ignores facts that are of the very essence of the agreement. Defendant did not conceal from plaintiff the existence and character of the ban prior to cancelling the contract. On the contrary, defendant had made a full disclosure almost two years before. In fact, at that time, defendant gave notice of cancellation for the very reason that this ban then existed, and it was at the request of plaintiff that this earlier notice of cancellation was annulled. So, plaintiff continued to render services under the contract for the defendant with full knowledge of the ban, and also of the fact that defendant, naturally, might at any time try to get the ban lifted, or might prefer to have it remain, depending upon which of the two situations, in its judgment, in view of its relations, past, present and prospective, with the United States Government, might, at the particular time, be deemed to be the more expedient, i. e., the more profitable.

We are not to be understood as declaring that there could be *no* circumstances when cancellation by the defendant, and its subsequent conduct, might not be tantamount to fraud upon the plaintiff from which equity should afford relief. If, in the absence of any embargo, the Turkish Government had said to defendant, "We are now ready to close on the sales basis offered on your behalf by plaintiff, your agent," and if thereupon defendant cancelled and put the Turkish Government off and did not close, i. e. did not execute a contract, until eight months had elapsed, this would be strongly evidential of fraud on defendant's part; and in the absence of a showing that it was not done deliberately for the very purpose of depriving plaintiff of his commissions, plaintiff might well have a right of recovery. But the distinction is clear. In the case supposed, defendant deliberately both cancels the agreement and then postpones the act, non-performance of which is the only thing that stands in the way of plaintiff's right to commissions, until, under the contract, limitations have run against the plaintiff; while, in the present case, there is no evidence that either the cancellation or the postponement of the execution of the contract had, proximately, any such purpose. To say that, since defendant had it in its power to get the United States to lift the ban, defendant could not take advantage of such lifting, to plaintiff's detriment, at a time when the agreement with plaintiff no longer existed—albeit it had, if we omit this latter consideration, been lawfully terminated—is to say something that is not according to the facts alleged, or reasonably to be implied in the complaint, and which we must accept as true—facts which clearly demonstrate that the contract with plaintiff did not destroy complete freedom on the part of defendant to sell or not to sell, at any time, to whomsoever it might choose, consistent with Government regulations, and to negotiate with respect to such regulations.

Plaintiff, in argument, supposes a situation as follows, and asserts that on such facts, to hold that the plaintiff would lose his right to commissions would be the height of absurdity and injustice, and that there is no difference in principle between such a situation and the one that actually occurred: The defendant cancels when both it and the Turkish Government have signified that they are ready, willing and able to close a sale; the very next day, an embargo, totally unexpected and unpredictable, is laid against the export of aircraft; this embargo lasts exactly eight months, that is to say, its duration is coincident with the eight months period specified in the contract; and on the day following the termination of the embargo, defendant consummates the postponed contract of sale with the Turkish Government. Such a state of facts contradicts an assumption that the defendant in any way concealed from the plaintiff knowledge which it, itself, had of the possibility of the embargo. But, if such concealment, in fact, occurred, this would impute bad faith, and throw the case into that class of situations to which we have already referred as being entirely distinct from the present state of facts.

It is, of course, axiomatic that the words employed in a contract should be given a reasonable, rather than an unreasonable construction, whenever this may be consistently done, which is but another way of saying that the law should endeavor to adopt that construction which is most equitable to the parties to the contract, and will not give to one of them an unreason-

able advantage over the other. However, the rule itself must always be applied *reasonably,* and will not be stretched to accomplish a result which cannot be accomplished without in effect redrafting the agreement. That is to say, the law does not protect against conditions, harsh though they may be, which a party to a contract has seen fit voluntarily to impose upon himself. There is not the slightest suggestion in the facts in the present case of any misrepresentation, concealment, duress or any influence of any kind having been brought to bear upon the plaintiff by the defendant.

In view of what has already been said, it is not necessary to dwell at any length upon the second contention of plaintiff, that the ban of the 'United States Government against exportation of aircraft operated to suspend the agency relationship between plaintiff and defendant, with the result that the right reserved to defendant to cancel was likewise suspended, and that the extra eight months' period did not begin to run until the ban was removed. That is to say, plaintiff contends that both parties to the contract intended that the plaintiff, after several years of effort and expense, should have at least an eight month period during which the right to compensation might arise; that this period did not begin to run until the time when the embargo was lifted, namely, in June, 1936; that even assuming the cancellation to be valid, the eight month period would, therefore, not expire until February, 1937, with the result that the sale which defendant executed in December, 1936, was within the eight month period. This contention seeks to harmonize the present state of facts with the rule that is applicable where a temporary restriction or embargo prevents one of the parties from carrying out the performance to which he had actually obligated himself. Of course, it is true that in such cases, the contract may be suspended temporarily during the existence of the restriction or embargo, and a party may be refused right of cancellation or action for breach of contract on the ground of non-performance by the other party, due to such temporary restriction or embargo. See American Lumber Co. v. Atlantic Mills, etc., Co., 3. Cir., 290 F. 632; Williston on Contracts, Rev.Ed., Sec. 1958. But obviously, this rule cannot be extended so that a right to cancel expressly reserved in the agreement itself is suspended because of an embargo

or some other restriction, making performance temporarily impossible. The rule referred to has to do with "impossibility" of performance. It affords to the delinquent party an excuse, a defense. It cannot, in a case such as the present, be converted into a right to affirmative relief.

Finally, we come to a consideration of the allegations and prayer for relief in the complaint, based upon quantum meruit, or fair value of the services rendered. It is obvious, by the express terms of the contract, that plaintiff is entitled to the commissions stated in the contract, or to nothing. Refusal of the defendant, as appears from the correspondence, to modify the contract upon the request of the plaintiff, so as to make the defendant liable to the plaintiff for a current monthly allowance for out-of-pocket expenses, to be ultimately deducted from commissions, even though defendant admitted plaintiff would have to incur such expenses, serves to corroborate this conclusion.

The Maryland law allows no quantum meruit recovery under such circumstances as those existing in the present case. That is to say, where, as here, the defendant, in terminating the contract, has not violated its terms but has acted entirely within them, unless the plaintiff has a right of recovery in accordance with the provisions set forth in the contract itself, which we have found the plaintiff has not, plaintiff cannot resort to a quantum meruit. Jenkins v. Long & Byrne, 8 Md. 132; see, also, Fuchs v. Standard Thermometer Co., 178 Mich. 37, 144 N.W. 484.

This rule is given in the Agency Restatement as follows: "(1) Unless otherwise agreed and except as stated in Section 454, an agent whose compensation is dependent upon the accomplishment of a specified result is not entitled to compensation for services rendered in an unsuccessful effort to accomplish that result before the rightful termination of the agency, although the principal is thereby benefited, if the services are not part of the agreed exchange." In the Comment upon this rule, after explaining that normally if a contract in which one of the parties has rendered services terminates without his fault, he is entitled to the reasonable value of such services, although the condition upon which it was agreed that he should receive a specified amount has not occurred before the termination, the following is stated: "However, the parties are bound

by the bargain which they make and if, adverting to the possibility of termination before performance is completed, they provide that no compensation shall be given for merely part performance, such agreement is enforced. *Likewise, the conditions under which the performance is undertaken may indicate that there is to be no compensation for partial performance, although resulting in benefit to the other party.* This is ordinarily true in transactions, contingent in nature, in which failure is foreseen as more probable than success, and hence the compensation in case of success is greater than the supposed value of the efforts made in a particular case. In such cases, the services rendered are not a part of any bargained-for exchange; if they do not effectuate the result for which compensation is to be paid under the specified conditions, no compensation is due although they confer benefit upon the other party." (Italics inserted.)

It follows that, since the complaint fails to state a cause of action, defendant's motion to dismiss must be granted.