## BOWIE *v.* MARTIN

[No. 62, October Term, 1951.]

*Decided January 10, 1952.*

The cause was argued before MARBURY, C. J., and DELAPLAINE, COLLINS, HENDERSON and MARKELL, JJ.

*Joseph T. Sherier* and *Nicholas Orem, Jr.*, with whom were *Duckett, Gill & Orem* on the brief, for the appellant.

*C. W. Woodward, Jr.*, for the appellee.

MARKELL, J., delivered the opinion of the Court.

This is an appeal from a judgment for a real estate broker in a suit against another broker for half-commissions on a sale of a tract of 517 acres in Montgomery County. The case was tried before Judge Schnauffer without a jury.

Plaintiff and defendant are residents of Montgomery County and have offices in Washington, where defendant is also the head of a mortgage company. In March, 1947 the property in question was bought by Mr. Louis M. Denit from the Doyle estate, through defendant. After the purchase Mr. Denit asked defendant to proceed to resell it. Defendant posted a sign on it. Plaintiff came in defendant's office from time to time. Before the purchase plaintiff had discussed the property with defendant on several occasions. After the purchase defendant told plaintiff Mr. Denit had acquired the property and would resell it at $500 an acre.

Soon after the purchase defendant suggested to Alexander Hagner, a broker in his office, that Hagner offer the property to Melvin Gelman. Hagner took Gelman out to see the tract. In a letter, dated October 27, 1947, addressed to defendant, attention of Hagner, Gelman said, "My father and I have inspected the 500 acres on Viers Mill Road over the week-end and he and I both

feel that this is too large a proposition for us to handle at this time since we have several commitments already." Then and since defendant had been very actively making mortgages for Gelman in substantial amounts. From 1947 to May, 1950 contacts with Gelman were very frequent, two or three times a week, at defendant's office or by telephone. Alexander Hagner, after October, 1947 on quite a few occasions, submitted other properties to Gelman. When Hagner would call Gelman, for the first time after six or eight months, Hagner "brought up the fact that the Doyle tract was till available, and [Gelman] mentioned the fact that they were making headway on their big sub-division but that he still thought he shouldn't bite into it until they got farther advanced." Gelman testified that after the letter of October 27, 1947, he did not become active again concerning the property until after plaintiff and Robert Hagner (whom plaintiff had associated with him in this undertaking) had shown the property to Gelman's father in April, 1950.

In the spring of 1950 plaintiff went to see Mr. Denit about a sale of the property, and was given the price but was referred to defendant as having exclusive authority. Plaintiff and defendant agreed that plaintiff might sell the property and if he did they would split the commissions fifty-fifty. On May 5, 1950 the property was sold to Gelman for $510 an acre and later conveyed to him and his father, Elias Gelman. Plaintiff sued for half the usual five per cent commissions, which were received by defendant from Denit.

Both plaintiff and defendant and the trial court seem to agree that this case is governed by the same legal principles as if defendant were owner instead of exclusive agent or broker. We take the same view. As the legal principles which govern such cases have long been settled, the issues in this case are essentially questions of fact, some but not all depending upon inferences. On appeal we "may review upon both the law and the evidence, but the judgment of the trial court shall not be set aside

on the evidence, unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." Trials. Rule 9 (c). All the testimony was taken in open court. The witnesses include plaintiff, defendant, Gelman and both Hagners. Defendant's testimony itself is not altogether consistent. There are also conflicts between plaintiff's and defendant's testimony, and between defendant's and Gelman's. In a full opinion Judge Schnauffer reviewed the law and the facts and indicated that he believed plaintiff's testimony, but did not believe all of defendant's, and considered Gelman "a very elusive witness". On the testimony the question before us is not whether plaintiff or defendant was right but whether Judge Schnauffer was clearly wrong.

Defendant testified that during the period his sign remained on the property (until after the sale to the Gelmans) "I must have had between forty and fifty inquiries about the property, about one-third of which were from other agents, the remainder from purchasers who wanted to buy it direct." Notwithstanding all these "inquiries", the evidence indicates only two "prospects" who showed any marked disposition to purchase, both of whom were procured—or at least stimulated—by plaintiff. Soon after plaintiff made his arrangement with defendant he showed the property to Robert Hagner and employed Hagner to help him obtain a purchaser. Hagner, through inquiries of his own, heard of Elias Gelman and telephoned him, Gelman came to Hagner's office and Hagner later showed him the property. Later Hagner and plaintiff met Elias and Gelman at the Gelmans' office.

Meanwhile, on April 26th (Wednesday) plaintiff presented to defendant at his office another "prospect", Emil K. Duvall and Sidney J. Abraham, who made a deposit of $12,500 with defendant and received from him a receipt, "April 26, 1950. Received of Emil K. Duvall and Sidney J. Abraham a deposit of $12,500 on account of the purchase of that piece of land containing

517.42 acres known as the Doyle tract, with a frontage on Viers Mill Road and Aspen Hill Road. It is now deposited with the undersigned pending the preparation of a contract to purchase at $500.00 per acre, settlement in ninety days, with the right to forfeit the deposit and be relieved if sale is not consummated." Defendant testified that on May 3rd (Wednesday) Mr. Abraham called up and said, "We can't complete that contract, so please return my check." Defendant returned the check, with a letter in which he said, "I am sorry that you have had to withdraw from the negotiations for the purchase of the Doyle tract. If they can be re-opened before the property is sold, I will be glad to hear from you." Defendant, however, also testified, "The principal reason [why the Duvall and Abraham contract or offer was rejected by Mr. Denit] was that it wasn't a firm offer to buy; it was an option. As the receipt stated, they had the right to forfeit the deposit if they saw fit to do so and be released of any further responsibility to comply with the terms of sale."

Gelman testified that plaintiff and Robert Hagner "must have been in [his office] two or three times"; their last visit must have been the day before May 5th, or within a couple days; "it all took place within a couple days; * * * there was never any appointment made [for plaintiff and Robert Hagner and the Gelmans] to go down [to defendant's office] as I remember. I know that they were trying to get in touch with Mr. Bowie, and Mr. Bowie, they claimed, was out of town or something like that and they couldn't get hold of Mr. Bowie to make an appointment. * * * They said that there was another deal pending at the time"; they did not say that they would have to wait until this was cleared up one way or another before making an appointment for the Gelmans to go to defendant's office. At the argument it was asserted for the defendant that the statement that defendant was out of town was false; this assertion is unsupported by evidence.

Robert Hagner testified that Elias Gelman wished to go to defendant's office at once, but his son prevented him from doing that because there was another prospect, another contract pending; later he called Gelman on the telephone; "we had an appointment to go the following Monday [May 8th], and the first deal had not been consummated either way or rejected."

Plaintiff testified that he made an appointment with Gelman and his father to go with them to defendant's office on Monday. He added that they postponed it because they were afraid defendant would raise the price; on defendant's motion, the court struck out this statement as "merely a conclusion". Plaintiff also testified that he did not go on that date "for the simple reason he [Gelman] told me not to"; the court sustained defendant's objection to this statement of the reason for not going.

It is not clear just how much testimony in the record was ultimately "stricken out", how much left in or reinstated. At times both parties were too strict in their objections, and perhaps the court in rulings, that statements by or to Gelman in the presence of plaintiff or defendant, but not both, were hearsay. The rule against hearsay is not applicable to "verbal acts" which may constitute relevant conduct of the parties, e. g., on questions of procuring cause or intent. In any event the judgment below cannot be upset on contentions unsupported by evidence and contrary to testimony in the record, whether "stricken out" or not below.

Whatever conflict or uncertainty there may be as to what was said or proposed or agreed at plaintiff's last meeting with Gelman, there is none as to what was done afterwards. Defendant testified that Gelman telephoned him about May 1st or 2d, that he told Gelman he had a contract in the office with a deposit of $12,500, "that man has the first call on this property at $500 an acre, the asking price", that Gelman said, "Suppose I would pay more", and he replied that the owner would be glad to hear that and if Gelman would present an offer of

more, it was defendant's duty as agent to submit it to him immediately. On Friday May 5th Gelman and his father appeared, offered $510 an acre, defendant "wrote the contract", they took it to their lawyer, "who made some minor corrections, they signed it, gave me their check, and I went across the street to Mr. Denit's office, * * * Mr. Denit promptly approved it, and the Gelmans' copy was delivered to them that afternoon." Gelman testified, "But as time went on it didn't look like there was any kind of deal being made at all, and we didn't want to lose the property, I having known Mr. Bowie indirectly in the fact that we had been doing some business down in his office, securing mortgages and so forth, I just got on the phone and called Mr. Bowie, and I asked him, I said, does he still have the property for sale; he said, well, he had a contract in the office at the time for the asking price; I said, 'Suppose you get a little bit more'; well, he said it was his duty to submit anything to his client if he got more for it; I said, 'I want to come down to see it', and we went down there and made apparently a better offer than he had because our offer was accepted. * * * We didn't want to let the property slip through our fingers and it didn't look like we were going to be able to acquire it working the way we were going, and I felt no reason why we shouldn't have called Mr. Bowie's office because he was the first man that showed it to me; I didn't believe that I was going over anybody's head; and I felt I owed some obligation to them."

Defendant testified that the Gelmans did not tell him plaintiff and Robert Hagner had been talking to them about the Doyle tract; the first notice he had of it was when plaintiff and Robert Hagner (on Monday May 8th) came in and demanded half commissions. He showed them Gelman's letter to Alexander Hagner of October 27, 1947 and said, "This is the answer to your claim for a part of this commission, you have stumbled across our customer, we showed the man this property back in 1947." He also testified that he paid half commis-

sions to Alexander Hagner, but not that he did so before plaintiff claimed commissions. Judge Schnauffer found "that Mr. Bowie knew or from the facts should have known that the Gelmans were directed to his office by the plaintiff, and it further being almost a conclusive fact from the testimony that one-half of the commission was paid to Alexander B. Hagner after the plaintiff had made his demand, he made such payment at his own peril and should not have too much trouble in getting it back in that Alexander B. Hagner is connected with his office." In so finding Judge Schnauffer was not clearly wrong.

Defendant urges several contentions, not altogether consistent. At the argument it was stated that his principal contention was that plaintiff was not the procuring cause of the sale. Judge Schnauffer says "that it is a conclusive fact that the Gelmans went to see Mr. Bowie as a result of the efforts and activities of the plaintiff. The defendant denies that the Gelmans divulged to him that the plaintiff had been in contact with them; however, the case now under consideration becomes stronger on behalf of the plaintiff in that Melvin Gelman has testified that he could have [informed] and probably did inform the defendant that he and his father had been contacted by the plaintiff, and in turn the court feels that the language used in the concluding paragraph of [the opinion in *Mayhew v. Meehan,* 176 Md. 599, 606, 6 A. 2d 223, 225] is applicable in this case: 'Giving due weight to all the evidence found in the record and to the inferences naturally deducible therefrom, we are constrained to hold that appellee established the contract which she alleges.' ". Without further discussion of the testimony above mentioned, it will suffice to say that we are satisfied that Judge Schnauffer was not clearly wrong in this statement.

In this court defendant stressed a contention that plaintiff is barred from any recovery by bad faith, in that he failed to disclose to defendant that he had procured Gelman as a purchaser, and that he did not promote the sale to Gelman but tried to block it in order to

effect the sale to Duvall and Abraham and later to make another sale to Gelman at an advanced price. This contention is argued with ingenuity but is not supported by facts; apparently it was not made below. We need not repeat evidence already stated at undue length. There is no evidence that plaintiff was inactive or dilatory or acted in bad faith. Producing two "prospects"—apparently the only produced by anyone—indicates not bad faith but zeal and activity. Mention of another prospect did not block the sale to Gelman but had the natural effect of stimulating Gelman's determination to get the property. If plaintiff had not acted promptly the stimulus of competition would have been lost. We cannot accept defendant's contention that in effecting the sale to Gelman bad faith and bad judgment on plaintiff's part were overcome by good luck or reject the natural inference that the sale was the result of good faith and good judgment.

If plaintiff had tried to effect a sale at the lowest possible price, bad faith would have barred recovery. *Wadsworth v. Adams,* 138 U. S. 380, 11 S. Ct. 303, 34 L. Ed. 984. If defendant had not sold to Gelman, plaintiff could not have recovered without disclosing to defendant that he had procured Gelman as a purchaser able and willing to buy. *Coppage v. Howard,* 127 Md. 512, 522-523, 96 A. 642. But unless the owner sustains loss or damage, *e. g.,* by paying another broker without notice or reason to inquire and ascertain that the broker claiming was the procuring cause, recovery is not barred by the mere fact that the owner did not know that the broker was the procuring cause. *Slagle v. Russell,* 114 Md. 418, 430-433, 80 A. 164; *Mayhew v. Meehan, supra.* See also *Restatement, Agency,* § 448, quoted by Judge Schnauffer.

*Judgment affirmed, with costs.*