**FERNANDO R. SARI, Incorporated,**

v.

**Marion E. WEST and Carlos E. Dixon.**

**Civ. A. No. 9612.**

United States District Court
D. Maryland,
Civil Division.

April 3, 1958.

Leonard S. Melrod, Washington, D. C., John J. Ghingher, Jr., Weinberg & Green, Baltimore, Md., for plaintiff.

George D. Solter, Due, Nickerson, Whiteford & Taylor, Baltimore, Md., David A. McNamee, Beatty & McNamee, Hyattsville, Md., for defendants.

CHESNUT, District Judge.

The plaintiff and defendants are and have been for several years past, real estate brokers in Washington, D. C., and Prince George's County, Maryland. In 1956 the defendants, acting with authority from the owners, made a sale of farm property containing 250 acres to a purchaser known as Parkal Building Corporation. Their commission as finally paid by the owners amounted to $44,117. The plaintiff seeks to recover one-half of that amount on two grounds (1) by virtue of a special oral agreement between it and the defendants, and (2) because it was the procuring cause of the sale. The case was tried non-jury.

From the rather lengthy evidence in the case I make the following findings of principal and important facts, largely chronologically.

1. In 1953 a family known as D'Arago owned a farm consisting of about 250 acres fronting largely on the Marlboro Pike in Prince George's County, Maryland, situated about three miles from the District of Columbia Line. On October 15, 1953, the mother in this family died and the title passed by inheritance to a daughter and her father. The father was an aged person and Miss D'Arago acted for the family after her mother's death. The size and location of this property and its proximity to the City of Washington at once attracted the attention of many real estate dealers to the possibility of the sale for development or similar purposes, and many real estate brokers in Washington and Prince George's County interested themselves in the possibility of effecting a sale. The defendant, Marion E. West, who has been a practicing lawyer in Prince George's County for many years past, was the attorney for the family in the settlement of the mother's estate. While Miss D'Arago was not averse to selling the property, the first immediate problem was to ascertain approximately what would be the amount of federal estate taxes which must be paid from the proceeds of sale and she consistently refused to authorize any one to

sell the property until this had been determined. She had also been personally acquainted for some time with the defendants and assured them that when she was ready to authorize a sale the so-called "listing" or authority to sell would be given to them. Dixon was a partner with West as real estate brokers.

■ ■ 2. Fernando R. Sari was the president and active officer of his corporation, the plaintiff in the case. He was one of the many brokers who, shortly after the death of Mrs. D'Arago, interested himself in the possibility of selling the property. He visited Miss D'Arago for the purpose of possibly obtaining her authority to him as broker to negotiate for a sale. He testified that she said that while she was not then ready to sell, as the estate had not been settled, she would give him "preferred" consideration when she was ready to sell. Miss D'Arago, however, flatly contradicted that and indicated in her testimony that she did not and would not have given him the listing of the property. She did, however, refer him to her attorney, Mr. West, whom he went to see early in 1954. Sari testified that on that occasion the special agreement was made between him and West which was to the effect that whenever West sold the property for the D'Arago family he, West, would pay Sari one-half of the commissions received whether or not Sari was the procuring cause of the sale. Or, as Sari as a witness expressed it, "You (meaning West) will be the attorney and I will be the broker". West denied explicitly that any such agreement had ever been made but that on the contrary all that he agreed to was (as in the same situation with a number of other brokers) that if and when Miss D'Arago authorized West to sell the property he, West, would divide commissions with Sari if the latter submitted a contract to buy the property which would be accepted by the D'Aragos. The special agreement as alleged by Sari was not in writing and not evidenced by any collateral contemporary correspondence. Such an agreement would have been a very unusual one between brokers and would have entitled Sari to one-half of the commissions irrespective of whether he, Sari, was the procuring cause of the sale or not. Furthermore, it is to be noted that at that time West had no authority from the owner to offer the property for sale. There is no incidental or collateral corroboration of Sari's contention. He has been an active real estate broker for 25 years but now is quite hard of hearing, using a hearing aid, and finds it difficult in expressing himself clearly as a witness. The question as to what was the agreement between Sari and West is purely a question of fact. The preponderance of proof would be upon the plaintiff who asserts it. Having heard both the parties as witnesses and having had an opportunity to consider their testimony respectively in the light of all the evidence in the case, I find as a fact that Mr. Sari's version of the agreement is not sustained and that Mr. West is correct.

3. The remaining question in the case to which most of the evidence related was whether in the absence of the special agreement asserted the plaintiff was entitled to one-half of the commissions as the procuring cause of the sale, and on this point I find the following facts from the whole evidence.

4. In 1954 as a real estate broker Sari tried to interest Mr. Lehrman, an officer of Giant Food, Inc. (a corporation operating a chain of supermarket retail stores in Maryland, Virginia, Washington and elsewhere) in the purchase of some property in Prince George's County, Maryland, as another location for a Giant Food Store. He showed Mr. Lehrman several properties in the vicinity of the D'Arago property and in the course of their journey they passed near the D'Arago property, and Mr. Lehrman said he might be interested in some way in having a Giant Food Store located there. Thereafter from time to time Sari telephoned or otherwise talked to Lehrman in a general way about the matter but without any special interest being shown by Lehrman and certainly without any

offer being made by Lehrman either tentatively or indirectly.

5. Sometime shortly before June 1955 a Mr. Pennybaker, a real estate salesman for S. F. & G., Inc., a real estate brokerage office, had obtained a written offer from a man named Libby, to purchase the D'Arago property for $500,000. This offer was submitted to Mr. West but was flatly rejected by Miss D'Arago and the offer returned to Pennybaker. Shortly thereafter a second written offer was submitted to West with subordinate changes in the terms of the offer but was again definitely refused by the owner. Still later on June 8, 1955, a third written offer from Libby to purchase the property for $750,000 was likewise submitted to West but was again definitely rejected by the owner. Libby was not introduced to West by Pennybaker and West did not know who Libby was, although it subsequently developed that Libby was associated in business as a partner with Abramson and another under the name of Tower Construction Company, which, among other things, was engaged from time to time in the development of land sites. The business relationship of Libby and Abramson was not known to either West or Dixon until a few days before the making of the contract of sale of the property.

6. In October 1955 it was suggested to Sari that he might interest a Mr. Abramson, a real estate developer, in the purchase of the D'Arago land known as Purity Farm. Shortly thereafter Sari showed the property to Abramson and from time to time contacted him for the purpose of arousing his interest in the property. In January 1956 Sari engaged a Mr. Osborne (afterwards his son-in-law) as an assistant and thereafter in February 1956 Sari, having become temporarily ill, had Osborne continue to contact and interest Mr. Abramson. The latter went to Florida early in February. So far nothing had developed favorably with Abramson.

7. About February 24, 1956, Sari learned that the D'Aragos had finally given a listing of the property to West & Dixon, that is had given them authority to sell the property for a certain minimum amount. Sari, who was then personally indisposed, arranged through his assistant, Osborne, a meeting at his, Sari's apartment in Washington between Lehrman and Abramson on the one hand, and West & Dixon on the other.

8. On February 29, 1956, this meeting was held and Sari for the first time introduced Lehrman and Abramson to West & Dixon. At that meeting it appeared that Abramson was interested in the possible purchase of the property while Lehrman had no such interest as purchaser. The first question asked by Abramson was whether West & Dixon had authority to sell. They replied that they had. The question was then asked as to the minimum amount, which was stated to be $1,350,000. Abramson said the price was entirely too high. Dixon volunteered the information, apparently not previously known to Sari or to the others, that the prospective purchaser for development purposes ought to know that in the close vicinity of the property a number of lots had been sold as a part of a large subdivision to Negro owners. The number and size of the lots so sold was not then fully known. Another question was whether the area could be zoned for commercial purposes. As a result of the conference no offer was made by Abramson or Lehrman (despite some contrary evidence by Sari and Osborne) and it reasonably appeared to both West & Dixon that neither was really interested in the property or willing to make any offer. Abramson said in substance that he was not interested in the property in view of the price and possible complications. Thereafter neither West nor Dixon gave any further thought or made any further efforts to interest Abramson and Lehrman in a prospective sale. Osborne, for Sari, did, however, on several days thereafter telephone West & Dixon, one or the other or both, to see if there was any more definite information about the number and size of the lots that had been sold to Negroes. But nothing further developed along this line

for several days when Osborne had to make a trip away. Neither Sari nor Osborne made any personal effort to obtain the information which, among other things, caused Abramson to express no further interest in the property. At that meeting Abramson may have known of the prior offers of Libby to buy the property in June 1955. But apparently Sari had never heard of Libby or his offer, and no reference was made by any one to Libby's offer. Neither West nor Dixon knew at that time that Abramson was a partner of Libby. Dixon had never heard of Libby or his offer and West had never met Libby and did not know who he was.

9. As a result of the meeting on February 29, 1956, Dixon, who had been more active than West in efforts to sell the property, having become satisfied that it was useless to proceed further with Abramson, started a new round of contacts with possible companies, persons or others who might be interested in the purchase. He had long previously made contact with Giant Food, Inc., and together with other possible prospects he again telephoned them on or about March 22, 1956. He did not ask for Lehrman or any particular person but in stating the nature of the purpose of his inquiry he was told by one Ferson, who answered the telephone call, that the matter would be referred to their real estate agent. Shortly thereafter Mr. Libby telephoned him expressing interest in the property. Dixon went to see Libby at his office which turned out to be the office of the Tower Construction Company. At that time Dixon had never met Libby and did not know that Libby was a partner of Abramson in the Tower Construction Company. On a second visit to see Libby, Abramson came into the room and Dixon then recognized him as the Mr. Abramson whom he had met on February 29th at Sari's apartment, and learned for the first time that Abramson and Libby were associated in business. A day or two later on another visit by Dixon to see Libby, the latter submitted a written offer to buy the property for $1,250,000. At that time West had accompanied Dixon at the latter's request. This offer was communicated to Miss D'Arago who was dissatisfied with the "partial release clause" in the proposed contract. She declined to accept the offer as then made but Libby submitted another offer meeting the objection with respect to the release clause which was thereafter accepted by Miss D'Arago and her father. The offer included a deposit in the amount of $25,000 on behalf of the purchaser named as the Parkal Building Corporation. The check was accepted and collected.

10. At the time the final written offer was submitted by Libby, West was present. He then learned that Abramson was a partner of Libby and that the property was being purchased in the name of the Parkal Building Corporation as a nominal or interim buyer with the ultimate objective of developing the property in a way to be determined thereafter. The formal written offers made by Libby in 1955 had been shown to West as the attorney for the D'Aragos but West did not then know who Libby was.

11. After the contract for the sale was made, difficulties or flaws to title to a large part of the 250 acres were found to exist. As a result of further negotiations it was agreed between the sellers and the buyer that the transaction should be consummated by the purchaser paying for 75 acres, largely fronting on Marlboro Pike, and the D'Aragos to retain title to the remaining 175 acres. The final price paid was about $880,000. The commission paid to West & Dixon by the sellers was $44,117.

12. Later in 1956 Abramson and Libby decided to and did form a new corporation known as Giant Food Properties, Inc., for which they solicited and obtained so-called subscriptions from the public and transferred to the new corporation the 75 acres of the D'Arago property together with other real estate holdings. Lehrman as an officer of Giant Food, Inc., had always been interested in locating a Giant Food Store on the D'Arago property. While he had no

contractual agreement with Abramson, he thereafter cooperated with him in financing the new corporation, Giant Food Properties, Inc. Subscriptions to its stock were made by Lehrman personally together with others interested in Giant Food Stores and a so-called pension fund of Giant Food, Inc., also became a stockholder in Giant Food Properties, Inc. It is expected that a building will be erected and leased to or operated by Giant Food, Inc., as a supermarket on the property purchased by the Parkal Building Corporation.

13. In 1956 S. F. & G., Inc., real estate brokers, brought suit against West & Dixon for one-half of the commissions received by them for the sale of the D'Arago property. The stipulated amount of commissions was 5% of the contract price. This suit was brought in the Circuit Court for Prince George's County, and on trial resulted in a verdict in favor of S. F. & G., Inc., for about $18,000, of which amount about $13,500 has been paid and the case terminated.

14. On or about April 2, 1956, Sari learned that the sale of the D'Arago property had been through West & Dixon and thereupon by his Washington attorneys wrote a letter to them demanding one-half of the commissions. This was refused by Mr. West by telephone at which time he stated he did not consider that Mr. Sari had any proper basis for his claim as he had not been the procuring cause of the sale.

15. The listing of the property by the owner, that is the authority given to West & Dixon to sell the property at a minimum of $1,350,000, was dated February 15, 1956, and a copy thereof was evidenced by an exhibit filed in the case. The contract to sell the property to Parkal Building Corporation dated March 25, 1956, and accepted in writing by the owners was also filed as an exhibit in the case. It is a lengthy document with many provisions with respect to the amount of the mortgage as a part of the purchase price and with provisions for release of portions of the property upon payment of certain stipulated sums. At the time it was understood by the parties than the Parkal Company was a nominal purchaser, thereafter to assign the contract to others to be later determined. The deposited check for $25,000 given in the name of the Parkal Company was duly paid. It was signed by Libby for the company. When the deed was later drawn to convey the 75 acres (pursuant to modification of the contract) the grantee named was Giant Food Properties, Inc. When the sale agreement was executed as of March 26, 1956, there was no contract or definite agreement between the Parkal Company or Libby and Abramson, one or the other or both, with Lehrman or Giant Food, Inc., that the latter would have the right to establish a supermarket on the property although it was apparently anticipated by Lehrman that such an arrangement would thereafter be made if he and his company assisted in necessary equity financing by Abramson and Libby. I find from all the evidence that at the time of the sale on March 26, 1956, the plans of the Parkal Company, the named purchaser, were fluid and uncertain and subject to future determination as events might develop.

16. Sari never submitted to West & Dixon any offer in writing or even verbal by any one to purchase the property. In fact Sari never received any offer even tentative from any prospective purchaser. His only contribution toward advancing in any way the possibility of a sale of the property was his introduction of Abramson to West & Dixon on February 29, 1956. The result of that meeting was entirely negative and unproductive at the time. I find from the evidence that West & Dixon definitely understood in good faith that there was then no further prospect of making a sale to Abramson. And I further find that that meeting was not the foundation for the sale made about a month later to Libby.

17. Counsel for the plaintiff does not charge either of the defendants or any other parties mentioned in the case including Lehrman, Abramson and Libby, with fraud in the matter of the sale and

I find no bad faith on the part of the defendants toward Sari in connection with the sale that was made.

18. The plaintiff was not the procuring cause of the sale.

■ This is a diversity case where the Maryland law must govern. The applicable principles of law can be found in very many reported decisions of the Maryland Court of Appeals. Where the suit for commissions is by one broker against another, the same legal principles apply as if the defendants were owners instead of exclusive sales agents. Burrell v. Frisby, 212 Md. 181, 186, 129 A.2d 75; Baliles v. Bryant, 207 Md. 332, 336, 114 A.2d 601; Bowie v. Martin, 199 Md. 58, 61, 85 A.2d 786. Counsel for the plaintiff rely particularly on two Maryland cases thought to present nearly analogous factual situations. They are Warshawsky v. Traub, 156 Md. 597, 144 A. 833, and Steele v. Seth, 211 Md. 323, 127 A.2d 388. Counsel contend that both cases establish as the applicable principle that "if the plaintiff procured the purchaser, or his efforts laid the foundation for the sale, the fact that he did not participate in the final negotiations does not deprive him of the right to the commissions claimed." And the language in these cases is referred to to the effect that the phrase "procuring cause" is satisfied if the testimony admits of the inference that the sale was accomplished as the result of the plaintiff's action in discovering the purchaser, showing them the property, and introducing them to the defendants. And again, if the plaintiff produced the purchaser and was prevented from consummating or "frozen out" of the final sale, he is entitled to the commissions claimed. While these principles are sound they are not controlling here on the whole evidence in the case summarized in the above findings. The plaintiff considers the meeting of February 29, 1956, at Sari's apartment as the foundation for the subsequently made sale. I do not find this to be so. Nor do I think the evidence in the case justified the inference that the sale was accomplished as a result of the plaintiff's action in introducing Abramson to the defendants; nor do I think the plaintiff was prevented in any way by the defendants from consummating a sale or frozen out of the sale made through the defendants.

■ I have carefully considered the able and extended argument of counsel for the plaintiff on the facts of the case in the evidence. In condensed substance it is this. Lehrman, Abramson and Libby should be considered as a "syndicate" which all along, although acting separately and with somewhat different interests, were cooperating to acquire the property. While acting separately before the sale they ultimately came together in satisfaction of their respective interests after the sale. Therefore they should be regarded as prospective purchasers from time long prior to the actual sale; and that as their respective interests were satisfied after the sale they should be regarded as an entity throughout. Or, even more shortly stated, the argument is that as they prospectively had the same objective even though not liquidated as to their respective interests until long after the sale, Sari is entitled to have them regarded both as the prospective and the ultimate purchasers of the property for their respective interests.

This is perhaps a plausible argument from the standpoint of the plaintiff but it is not the reasonable conclusion on the facts to be found in the evidence. While Lehrman and Abramson and possibly Libby may have anticipated among themselves before the sale that their respective interests might be satisfied if a satisfactory purchase was made, it is clear enough on the evidence that Lehrman never had any intention of becoming a purchaser of the property either individually or by Giant Food, Inc. And neither Libby nor Abramson ever had any agreement that Lehrman and his associates would, if necessary, aid in the financing of their plans. This was a much later development after the sale. Furthermore, the argument entirely overlooks the matter from the stand-

point of the defendants. While they probably knew that Lehrman was representing Giant Food, Inc., and that Abramson was on February 26, 1956, at that time interested as a possible purchaser, the result of the February 29th meeting was that no one submitted any even tentative offer for the property or held out any prospects of doing so in the future. I am satisfied that the defendants in entire good faith left the meeting with the understanding that neither Lehrman nor Abramson were then further interested as prospective purchasers. Dixon acted on this understanding by promptly endeavoring to interest others as purchasers. It was, so far as he knew, purely a new matter that Libby approached him with regard to the sale. As Sari had never known Libby and never mentioned his name to Dixon, the latter was entirely justified in assuming that Libby was his, Dixon's prospect, and certainly not Sari's. Libby was never a customer or prospect for Sari. Indeed we find that Libby had become acquainted with the property through another broker, S. F. & G., Inc., and about a year before had submitted an offer in writing through the other broker (not connected in any way with Sari) to buy the property. So far as the defendants were concerned, Libby was their discovery as a prospect not in any way due to Sari's prior efforts. On the plaintiff's theory that Lehrman, Libby and Abramson constituted a syndicate entity that subsequently became the purchaser, it would be more plausible to argue (as may have been successfully done in the State Court case) that Pennybaker of S. F. & G., Inc., rather than Sari was the procuring cause of the sale.

The plaintiff also contends that the introduction of Abramson to West and Dixon on February 29th should be regarded as the foundation for the sale subsequently made to Libby or the Parkal Corporation, the nominee of Libby and Abramson; and therefore Sari was the procuring cause of that sale. But it requires more than the mere introduction of one who subsequently becomes associated with the ultimate purchaser to make the introduction the procuring cause of the sale. This clearly appears from the following Maryland cases. In Martien v. City of Baltimore, 109 Md. 260, 71 A. 966, 969, the Court of Appeals said:

"In the early case of Keener v. Harrod, 2 Md. [63], 70, the court said: 'We understand the rule to be this: That the mere fact of the agent having introduced the purchaser to the seller, or disclosed names by which they came together to treat, will not entitle him to compensation,' unless it appears that such introduction or disclosure was the foundation on which the negotiation was begun and conducted, and the sale made. And in the very recent case of Walker v. Baldwin and Frick, 106 Md. [619], 634, 68 A. 25, this court said: 'All the cases agree that the disclosure of the purchaser's name and the putting of him in communication with the defendant by the plaintiff, must not only be the foundation upon which the negotiations were begun, but upon which it was conducted and the sale ultimately made. * * * The broker must be shown to be the procuring cause of the sale. The intervention of the plaintiff in beginning the negotiations, and their subsequent culmination in a sale will not suffice unless those negotiations were the ultimate cause of the sale.' In other words, to entitle a broker to recover commissions for the sale or purchase of property, he must not only show his efforts or negotiations to accomplish the sale or purchase, but he must show that the sale or purchase was accomplished as the result of such efforts or negotiations."

And in Way v. Turner, 127 Md. 327, at page 328, 96 A. 676, the Court of Appeals said:

"The rule of law applicable to this description of cases has been frequently announced in nearly every

state in this country, with some slight variations of phraseology. It is concisely summed up in 4 R. C.L. p. 298, § 43, as follows: 'It is not enough that the broker has devoted his time, labor or money to the interest of his principal, as unsuccessful efforts, however meritorious, afford no ground of action. And it matters not after his failure and the termination of his agency what he has done proves of use and benefit to the principal. In a multitude of cases that must necessarily result. He may have introduced to each other parties who otherwise would never have met; he may have created impressions which under later and more favorable circumstances naturally lead to and materially assist in the consummation of a sale; he may have planted the very seed from which others reaped the harvest; but all that gives him no claim. It was part of his risk that, failing himself, not successful in fulfilling his obligation, others might be left to some extent to avail themselves of the fruit of his labor. To entitle a broker to commissions upon a sale or transaction which is actually consummated he must show that his efforts and services were the primary, proximate and procuring cause thereof.' And for this statement the author cites, among other cases, Keener v. Harrod, 2 Md. [63], 70; Tinges v. Moale, 25 Md. 480; and Blake v. Stump, 73 Md. 160, 20 A. 788, 10 L.R.A. 103."

This statement of the Maryland rule was applied by the Court of Appeals for the Fourth Circuit in an opinion by Judge Dobie in Tahir Erk v. Glenn L. Martin Co., 143 F.2d 232, at page 235, affirming a ruling of this court.

In Black's Law Dictionary, 4th Ed., p. 1374, procuring cause is defined as follows: "The approximate cause; the cause originating a series of events, which, without break in their continuity, result in the accomplishment of the prime object."

The mere introduction of Abramson to West & Dixon was not the beginning of a series of events which, without a break, in continuity, resulted in the ultimate sale. The introduction of Abramson accomplished nothing at the time and of itself led to nothing. His re-appearance in the matter a month later resulted from Libby's renewed interest in the property which was directly due to Dixon's renewed efforts not in any way attributable to his introduction to Abramson on February 29th.

I have considered the possibility that Libby's offer may have been influenced indirectly by Abramson after the latter had learned on February 29th that West & Dixon had the listing of the property; but if so, that is a mere suspicion not supported by the evidence in the case. It finds no support in the testimony of either Lehrman or Abramson, two of the principal witnesses for the plaintiff, and is clearly contradicted by the testimony of both West & Dixon, which has not been impeached.

Libby was not a witness in the case. It appeared that summons had been issued for him by both parties but he was then unavailable because in Florida. At the trial I suggested to counsel for both parties that I should like to hear Libby's evidence and gave them both an opportunity to produce him as a witness at a later time when available, if desired. Now several weeks after the conclusion of the case he has not been made available as a witness by either side. I must, therefore, decide the case on the basis of the testimony introduced. From this I find and conclude that Sari was not the procuring cause of the sale.

The Clerk is instructed to enter judgment for the defendants.