EDWARD KELLMAN, d/b/a Edward E. Kellman & Co., Plaintiff-Appellant, *v.* ARTHUR RUBLOFF & CO., Defendant-Appellee.

First District (2nd Division)    No. 78-216

Opinion filed January 30, 1979.

Seibert & Daniels, of Chicago, for appellant.

Schuyler, Ballard & Cowen, of Chicago, for appellee.

Mr. PRESIDING JUSTICE STAMOS delivered the opinion of the court:

Plaintiff, Edward Kellman, doing business as Edward E. Kellman & Co., brought an action against defendant, Arthur Rubloff & Co., a corporation, to recover one-half of the broker's commission received by defendant in connection with the sale of certain real estate for which defendant was the exclusive agent but had enlisted the aid of other brokers, including plaintiff. This appeal arises from a directed finding entered by the circuit court of Cook County in favor of defendant at the close of plaintiff's case. The pertinent facts follow.

In June or July of 1971, defendant, a licensed real estate broker, was given an exclusive listing by the Honeywell Corporation for the sale of property located at 8330 N. Austin, Morton Grove, Illinois. Defendant prepared a brochure describing the property and, as is customary in the business, mailed several thousand copies of the brochure to other brokers and potential prospects, informing them of the availability of the property. The purpose of sending the brochure to other brokers was to ask the help of brokers who specialize in finding buyers for large

industrial properties. William Cowhey, then defendant's vice-president and a broker specializing in industrial real estate, testified that if another broker were the procuring cause of the sale of the property, it was customary for the exclusive agent to split the commission received with the other broker.

Plaintiff is a real estate broker specializing in industrial real estate. Plaintiff had prior similar dealings with defendant and was well acquainted with defendant's agent, Cowhey. In July of 1971, plaintiff received a copy of defendant's brochure and called Cowhey for more information. Cowhey told him that the asking price for the Honeywell property was $2.5 million. Although defendant was authorized to sell at $2 million, Cowhey testified that $2.5 million was the offering price and the exclusive agent usually quoted this higher price to other brokers. Plaintiff asked Cowhey whether defendant would pay the usual one-half commission if plaintiff found the buyer, and Cowhey agreed that if plaintiff brought in a buyer who bought the property, plaintiff would receive one-half of the commission paid to defendant for the sale. Plaintiff replied that he might have some prospects and he would see what he could do.

Plaintiff began calling his prospects in an attempt to find a buyer for the Honeywell property. One such prospect was the Chicago Show Print Co. On November 1, 1971, plaintiff called Cowhey and told him that he had a prospect who wanted to go through the property. On November 5, 1971, plaintiff, Cowhey, and two Honeywell representatives showed the property to Larry Brasher, a representative of Chicago Show Print Co. Brasher was informed that the asking price was $2.5 million. Upon leaving the building Brasher told plaintiff that Chicago Show Print Co. could use the building, but $2.5 million was a little high. He asked plaintiff if Honeywell would take $1.5 million. Plaintiff replied that he thought that was too low, but if Brasher wanted him to submit an offer, he would. Brasher said that he wanted to take it up with his superior and made no offer.

A few days later, plaintiff called Brasher and Brasher told him that he wanted information about transportation to the property. Plaintiff called Cowhey, who provided the information, and on or about November 11, 1971, plaintiff called Brasher back and gave him the information. Brasher told him that Chicago Show Print Co. was experiencing pressure at its present location and was interested in seeing a smaller property as, in plaintiff's words, "it was too much pressure to make decisions on big properties." Brasher told plaintiff that Chicago Show Print hoped to take the big property up later, but was no longer interested at that time. In an entry dated November 15, 1971, plaintiff noted on his file card, which was admitted into evidence, that Brasher had taken the American Deco

building and had told plaintiff to call him in a year or so on the big space.

The next time plaintiff spoke with anyone from Chicago Show Print or from defendant was in the first week of July 1972, when Cowhey called plaintiff to inquire whether plaintiff was making any progress with Chicago Show Print on the Honeywell property. At about the same time, on July 6, 1972, Brasher called plaintiff concerning a different, smaller property that plaintiff had showed him, referred to as the Kolmar property. During their conversation, plaintiff told Brasher that the Honeywell property was still available. Brasher said that he would talk to his superior. Plaintiff's notes from that day reflect an entry that plaintiff was to check the Kolmar property.

On July 10, 1972, plaintiff called Brasher and told him that the Kolmar property was not available but the Honeywell property was. Brasher again stated that he would consult his superior and call plaintiff back. When Brasher did not call back, on July 11, 1972, plaintiff called him. When plaintiff asked him about the Honeywell property, Brasher became irritated and told plaintiff to quit pushing him, that if he was ready to do anything on it, he would call plaintiff and plaintiff was not to call him. A notation in plaintiff's file, dated July 11, 1972, reads, "Not likely. Drop it unless he calls. Rude and harsh." Brasher never did call plaintiff back, nor did plaintiff call him again at any time relevant to this litigation. On July 14, 1972, Cowhey tried to contact plaintiff. Plaintiff called him back and, Cowhey testified, told him that Chicago Show Print had no interest in the Honeywell property.

In early October 1972, about October 1, Brasher called defendant directly, as a result of Brasher's either seeing the "For Sale" sign on the building or reading defendant's newspaper ad. No one from defendant had had any contact with Brasher or anyone from Chicago Show Print since the showing of the property on November 5, 1971. On October 2, 1972, Cowhey called plaintiff to ask the name of the prospect to whom plaintiff and he had showed the Honeywell property, and plaintiff told him it was Chicago Show Print. Cowhey did not tell plaintiff that Brasher had contacted Cowhey directly. Cowhey took Brasher through the Honeywell property again on October 2. Brasher made an offer of $1.5 million for the property, which offer defendant submitted to Honeywell. Honeywell accepted the offer and Honeywell and Chicago Show Print entered into a real estate sales contract on November 8, 1972. After the deal was closed, defendant received the full commission of $75,000. Plaintiff made a demand upon defendant for one-half of the commission, but defendant refused to pay plaintiff any part of the commission.

Plaintiff then filed this action, alleging essentially that defendant had agreed to pay plaintiff half the commission received if plaintiff found a buyer who purchased the property, that plaintiff brought in and

introduced a prospective purchaser to defendant, that this prospect did purchase the property, and that defendant received a $75,000 commission on the sale but would not, after demand, pay plaintiff the one-half commission to which plaintiff had become entitled.

A bench trial ensued. At the close of plaintiff's case, defendant moved for a directed verdict.* Although this was a bench trial, the court ordered that a directed verdict* for defendant be entered and that plaintiff's action be dismissed. In doing so, the court specifically mentioned the *Pedrick* standard (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504), and said that even considering all the evidence most favorably to plaintiff, plaintiff had simply not met his burden of proof. ■■ This was error. Section 64(3) of the Civil Practice Act (Ill. Rev. Stat. 1977, ch. 110, par. 64(3)) specifically requires the trial court sitting without a jury to weigh the evidence when ruling on defendant's motion for judgment at the close of plaintiff's case. Thus, rather than consider the evidence in the light most favorable to plaintiff, as in a jury case, the court must weigh all the evidence, and then not simply decide whether plaintiff has made out a prima facie case, but make a final determination and enter judgment for defendant if plaintiff has not met his burden of proof by a preponderance of the evidence. (*Bau v. Sobut* (1977), 50 Ill. App. 3d 732, 735, 365 N.E.2d 724.) As we further noted in *Bau*, a reviewing court should not reverse the trial court's ruling on such a motion unless the ruling is manifestly erroneous. *Bau v. Sobut* (1977), 50 Ill. App. 3d 732, 735.

While the parties and the trial court exhibited some confusion about the proper motion and standard to be used in the instant case, it is apparent from the record that the court did find, based on all the evidence, that plaintiff had not met his burden of proof, and plaintiff would hardly be in a position to complain about the fact that in doing so the court mistakenly applied a standard more favorable to plaintiff's case.

We therefore consider whether the trial court's ruling in favor of defendant was manifestly erroneous. The court entered judgment on the ground that plaintiff had not met his burden of showing that he was the procuring cause of the sale, and therefore was not entitled to share in the commission. On appeal, defendant argues persuasively in support of this finding, citing cases holding that merely being the first to show the property sold to the ultimate purchaser is not sufficient to establish the broker as the procuring cause of the sale. Thus, in *Roegner v. Frey* (1918), 209 Ill. App. 303 (abstract), defendant had listed his apartment building with plaintiff broker for sale. Plaintiff showed defendant some vacant land and suggested a trade, but no agreement was reached. Subsequently, defendant responded to a newspaper ad offering to trade the same lots.

---

* Directed finding.

Defendant and the owner entered into negotiations and a trade resulted. In an action by plaintiff for a commission, the court held that while plaintiff may have been the first to bring the premises sold to the attention of the ultimate purchaser, his efforts were not the procuring cause of the exchange and no commission was due him.

Similarly, in *Watts v. Howard & Calkins* (1893), 51 Ill. App. 243, plaintiff broker showed a house to a Mr. Johnson in April. Some negotiations ensued, but Johnson declined to purchase. In July, plaintiff sent a letter regarding the same property to Johnson, who replied on July 7 that he was not ready to buy. At the end of August, after an advertised price reduction, Johnson appeared on his own, inspected the property, and this time decided to buy. In reversing a judgment for plaintiff in an action for a commission, the court stated:

> "It clearly appears that the effort made by appellees to effect a sale of the property of appellant entirely failed. Appellees did call the attention of Mr. Johnson to the property, but he declined to purchase, and there is nothing tending to show that appellees had not ceased all effort to sell to him, long before his attention was again called to the property by reading an advertisement inserted by appellant." (51 Ill. App. 243, 245.)

The court held that plaintiff was not the procuring cause of the sale and was therefore not entitled to a commission. See also *O'Leary v. Crow* (1978), 60 Ill. App. 3d 135, 376 N.E.2d 392; *Waghorne v. Hogstrom* (1956), 11 Ill. App. 2d 345, 137 N.E.2d 497 (abstract); *Kaplan v. Birk* (1953), 349 Ill. App. 538, 111 N.E.2d 377 (abstract); *Burns v. Sullivan* (1915), 192 Ill. App. 127 (abstract).

However, plaintiff argues that the "procuring cause" test is not applicable, and defendant's cases are therefore distinguishable, since this is not a case involving brokers competing against each other or going against their seller for a commission, but rather one involving cooperating brokers acting under an agreement to share the commission. In such a case, plaintiff argues, a dispute is not to be resolved by applying the "procuring cause" test, but by looking to the terms of the parties' agreement and the parties' performance thereunder. While there are no Illinois cases directly on point, plaintiff does cite some analogous authority to that effect from other jurisdictions. *De Benedictis v. Gerechoff* (App. Div. 1975), 134 N.J. Super. 238, 339 A.2d 225; *Armstrong v. J.H. Webber & Co.* (1916), 92 Wash. 295, 158 P. 957; *cf. Piper v. Allen* (Mo. App. 1920), 219 S.W. 98. Contra, *Melbourne v. Griffith* (1971), 263 Md. 486, 283 A.2d 363; see also *Van Poznak v. Ralph G. Schwebe-Meyer & Co.* (1948), 136 N.J.L. 486, 56 A.2d 871.

We agree that this distinction might have some meaning where the evidence established a special agreement that the plaintiff broker would

be entitled to a share of the commission for being something less than the procuring cause of the sale. (*Cf. Fernando R. Sari, Inc. v. West* (D. Md. 1958), 160 F. Supp. 390, 392.) But we question whether the distinction has any force where, as here, the agreement admittedly required production, not of a prospect or a hope, but of a buyer. Construction of such an agreement would seem to take us full circle and require an inquiry into whether plaintiff actually procured a buyer, rather than a mere prospect who later happened to purchase the property of his own accord.

██ However, we need not resolve this question, because even assuming plaintiff's argument that the "procuring cause" test is not applicable, we find defendant's second argument determinative: that plaintiff abandoned his efforts to perform under the contract, and, therefore, is not entitled to share in the commission. Plaintiff showed the property to Brasher, the ultimate purchaser's agent, in November of 1971. Brasher declined to make an offer and said he was not interested in the property at that time. Over seven months went by, during which plaintiff did not once contact either Brasher or defendant. In early July of 1972, Brasher called plaintiff, but concerning an entirely different property. When plaintiff attempted to renew Brasher's interest in the Honeywell property, Brasher told him that he was not ready to purchase and to quit pushing him. Plaintiff's own notation, dated July 11, 1972, states, "Larry Brasher. Not likely. Drop it unless he calls. * * *" Plaintiff never did call Brasher back prior to the sale, and on July 14, 1972, plaintiff told defendant's agent that Brasher was not interested. Approximately 2½ months later, as a result of his seeing either a newspaper ad or a "For Sale" sign, Brasher contacted defendant's agent directly and was once again taken through the property. Only then did negotiations ensue, resulting in a contract between the parties and a commission for defendant. Both the chronology of events and plaintiff's own statements and notes reflect an abandonment.

Similar gaps between a broker's unsuccessful efforts and the ultimate transaction have been held to constitute abandonment. Thus, in *Stone v. Moloney-Bennett Belting Co.* (1911), 159 Ill. App. 366, plaintiff broker showed the property in question to an agent of the prospective lessee, who declined to lease. About four months later, a representative of the lessee and a representative of the owner happened to meet. They again discussed the lease and this time reached agreement. On appeal from a judgment awarding plaintiff a commission, the court held that a verdict should have been directed for defendant, because even though plaintiff first showed the property to the ultimate lessee, his complete inactivity for four months demonstrated an abandonment, and the ultimate transaction resulted from entirely new and independent negotiations.

Also, in *Rheinberger v. Security Life Insurance Co. of America* (N.D. Ill. 1942), 47 F. Supp. 196, plaintiff broker introduced the

prospective tenant to the owner on October 29, 1940. A sale was discussed but no offer was made to buy or lease. Plaintiff did nothing further except to write a letter to the owner, expressing hope. In February of 1941, the prospect ran an ad seeking to lease property and defendant contacted him directly, resulting in a lease. The court held that the four month time lapse without any communications between the broker, prospect, and owner after the initial unsuccessful negotiations was sufficient to establish abandonment. See also *Lill v. Burns* (1954), 4 Ill. App. 2d 588, 124 N.E.2d 553 (abstract); *Lipe v. Ludewick* (1883), 14 Ill. App. 372.

Plaintiff does not seek to distinguish these cases, nor can we discern any meaningful basis for doing so. Plaintiff cites other Illinois cases with slightly different statements of the general principles, but in none of them was there any hiatus between the broker's efforts and the ultimate transaction, and thus none can have any application here. Even in the two cases from other jurisdictions which lend most support to plaintiff, the courts add the proviso that there must have been "one continuous transaction" (*Armstrong v. J. H. Webber & Co.* (1916), 92 Wash. 295, 158 P. 957, 958), with "no significant break in the negotiations." *De Benedictis v. Gerechoff* (App. Div. 1975), 134 N.J. Super. 238, 244, 339 A.2d 225, 229.

■■ Plaintiff contends that defendant owed him an obligation of good faith (citing 12 C.J.S. *Brokers* §81 (1938)), which, plaintiff argues, was somehow breached by the fact that defendant told plaintiff the asking price was $2.5 million, when defendant was authorized to sell at $2 million, and by the fact that defendant's agent did not inform plaintiff that his former prospect had contacted defendant directly. However, as to the former, defendant's agent testified that this was usual and customary in the business, and the latter appears to be a defensible business practice. We find no breach of any obligation of good faith on the part of defendant.

■■ Therefore, we find that the trial court's ruling, far from being manifestly erroneous, was justified on the facts and under the law. While our affirmance rests on a slightly different ground than that stated by the trial court, a reviewing court can affirm a judgment of the trial court on any basis appearing in the record. *E.g., Third Swansea Properties, Inc. v. Ockerlund Construction Co.* (1976), 41 Ill. App. 3d 894, 897, 354 N.E.2d 148.

Accordingly, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

DOWNING and PERLIN, JJ., concur.